258 N.J. Super. 41 (1992)
609 A.2d 65
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
LOUIS NUTTER, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued February 25, 1992.
Decided July 2, 1992.
*43 Before Judges ANTELL, LONG and THOMAS.
Mark H. Friedman, Assistant Deputy Public Defender, argued the cause for appellant (Wilfredo Caraballo, Public Defender, attorney).
Craig V. Zwillman, Deputy Attorney General, argued the cause for respondent (Robert J. Del Tufo, Attorney General, attorney).
Dell'Italia, Affinito & Jerejian, attorneys for Amicus Curiae, Association of Criminal Defense Lawyers of New Jersey (Edward A. Jerejian, on the brief).
The opinion of the court was delivered by LONG, J.A.D.
Essex County Indictment No. 31-8-10-88 charged defendant, Louis Nutter with murder, contrary to N.J.S.A. 2C:11-3a(1), (2) (count one); with fourth-degree unlawful possession of a knife, contrary to N.J.S.A. 2C:39-5d (count two); and with third-degree possession of a knife for an unlawful purpose, contrary to N.J.S.A. 2C:39-4d (count three).
After a jury trial, defendant was convicted on all counts. The trial judge merged count two into count three for sentencing and sentenced defendant as follows: on count one, to a custodial term of forty years with a thirty-year period of parole ineligibility and on count three to a concurrent five-year custodial term. An appropriate Violent Crimes Compensation Board penalty was also imposed.
Defendant appeals, contending that the following errors warrant reversal:

*44 POINT I:

THE TRIAL JUDGE'S REFUSAL TO INSTRUCT THE JURY ON AGGRAVATED AND RECKLESS MANSLAUGHTER OR INTOXICATION DEPRIVED DEFENDANT OF A FAIR TRIAL AND REQUIRES THAT HIS CONVICTIONS BE REVERSED.
POINT II:
THE TRIAL JUDGE'S FAILURE TO CHARGE THE JURY ON THEIR DUTY TO DETERMINE IF DEFENDANT'S STATEMENT WAS CREDIBLE AND HER INSTRUCTION THAT THEY COULD CONSIDER THE STATEMENT "AS EVIDENCE AGAINST HIM" IF THEY FOUND THAT IT WAS VOLUNTARILY GIVEN DEPRIVED DEFENDANT OF A FAIR TRIAL. [NOT RAISED BELOW].
POINT III:
THE TRIAL JUDGE DENIED DEFENDANT A FAIR TRIAL BY UNDULY LIMITING HIS RIGHT TO PEREMPTORILY CHALLENGE PROSPECTIVE JURORS WHEN A VACANCY WAS FILLED ON A JURY PANEL THAT HAD BEEN SELECTED BUT NOT YET SWORN.
POINT IV:
THE USE OF CLOSED CIRCUIT TELEVISION TO TAKE THE TESTIMONY OF LATEEFAH AND AJA GAINES VIOLATED DEFENDANT'S STATE AND FEDERAL RIGHT TO CONFRONT WITNESSES BECAUSE TESTIMONY BY CHILDREN WHO WITNESS THE KILLING OF ANOTHER IS NOT WITHIN THE PURVIEW OF N.J.S.A. 2A:84A-32.4.
POINT V:
DEFENDANT'S CONVICTION AND SENTENCE FOR POSSESSION OF A KNIFE FOR AN UNLAWFUL PURPOSE MUST MERGE INTO HIS CONVICTION AND SENTENCE FOR MURDER.
We have carefully reviewed this record in light of these contentions and have concluded that the use of closed circuit television to take testimony of the child witnesses in a murder case conflicted with N.J.S.A. 2A:84A-32.4 and hence violated defendant's Sixth Amendment right to confrontation. This error requires reversal and remand for trial.

I
The case arose out of defendant's admitted stabbing of Angela Gaines on April 28, 1988. During the Spring of 1988, Angela Gaines was living with defendant in an apartment at 46-D Spruce Street in Newark. Three children were also living with them at the time: Lateefah, then age nine; Aja, then age five; and six-week old Charissa. Defendant was Aja's father; Lateefah characterized him as her "stepfather."
*45 Lateefah testified to an incident which occurred about two months prior to Angela's death when Angela was eight or nine months pregnant with Charissa. At approximately ten or eleven o'clock in the evening, defendant and Angela were in their bedroom. Angela was on the bed and defendant was asleep on the floor. Angela, Lateefah and Aja began "pulling" defendant in order to wake him up to watch television with them. Defendant became angry and started "pushing" Angela. At this point, Cynthia Skelton, Angela's sister, arrived at the house to speak to defendant. Skelton and Angela tried to awaken defendant to no avail. The doorbell rang and Skelton went downstairs to answer it. As she went back upstairs, she "heard them fighting." Defendant was hitting Angela and she was fighting back. Lateefah testified that defendant pushed Angela causing her to fall over a bicycle. Skelton tried to break up the fight and defendant started swinging at both of them. Skelton went downstairs to get a frying pan and when she returned, Angela "was down on the floor and [defendant] was kicking and punching her" on her torso. While she was trying to break up the fight, defendant hit Skelton in the mouth, loosening her tooth. Skelton struck defendant with the frying pan on the back of the head, and defendant stopped hitting Angela. At that point, as defendant was leaving the bedroom, Skelton asked him why he fought with Angela when she was pregnant with his child. Defendant responded that "the little son-of-a-bitch wasn't his anyway." Lateefah testified that she saw defendant hit Skelton in the mouth and that she saw Skelton hit him with the frying pan. Skelton testified that Aja was in bed when this occurred and, at some point, Lateefah ran and locked herself in the bathroom.
Lateefah, along with Lorraine Baker (who lives in an apartment at 50-A Spruce Street in Newark), also testified concerning an incident which occurred on April 14, 1988, two weeks before Angela was stabbed. Shortly before 7:00 a.m., an argument erupted between defendant and Angela after she accused him of stealing two $500 money orders which she had *46 kept in a dictionary. Lateefah testified that the two came downstairs and were "pushing and punching and hitting each other and pushing each other on the floor." Defendant then punched Angela in the head and she fell to the floor. As Angela lay on the floor crying and bleeding, defendant sat her up and told her not to go to sleep but did not help her with the cut on her head and did not call the doctor. Rather, Angela told Lateefah to go to Baker's house to call an ambulance. Baker testified that Lateefah came to her apartment at approximately 7:00 a.m. and said that she wanted to use the phone to call an ambulance for her mother who had been hit in the head. Baker called the ambulance and then returned with Lateefah to the apartment. When Baker and Lateefah returned to the apartment, Lateefah observed that "stuff was all out and the table was turned upside down ... and [Angela] was sitting there and there was a big patch of blood on the floor." Baker testified that when she arrived, defendant was sitting on the couch with Charissa in his arms and was not trying to help in any way. Baker testified that as Angela was laying on the floor with blood "gushing out of her head," she called out to her. When Baker asked her "what was the matter," Angela told her that defendant had hit her. Baker then told defendant to leave because she thought that the police would be arriving soon. The ambulance came and took Angela to the hospital where she received stitches to close a laceration. Baker stayed with the children until Angela's mother arrived.
Baker testified that she spoke to defendant on the telephone a couple of hours later when he called to ask how Angela was doing. Defendant explained to her what had happened:
"He told me that Angie had the table in front of the door and she asked him for her money. She accused him of [stealing] the money and all of a sudden, he told me that she picked up something, what, and then he just snapped."
Baker testified on cross-examination that she saw Angela and defendant the following night in the apartment together and that they were "getting high." Lateefah testified on cross-examination *47 that at the time of both of these incidents, her mother had been drinking "a little bit."
Catherine Gaines, Angela's mother, testified that on April 27, 1988, Angela had called her at work to ask her to bring her some money which she needed to pay her bills. Catherine Gaines brought $500 to her daughter at her apartment and that was the last time that she saw Angela alive.
On the same date, Lorraine Baker and Angela went food shopping together. When they returned, Angela gave Baker either $300 or $500 to hold for her. Baker put the money under the rug in her bedroom. The next time Baker saw Angela was at approximately 3:00 a.m. on April 28, 1988 when she came over to get some of the money that she had earlier given to Baker. Angela went up to Baker's bedroom, woke her up and told her that she needed some money. Angela took some of the money and left. On cross-examination, Baker testified that Angela appeared to be high and possibly drunk when she came over to get the money that evening.
Lateefah and Aja were awakened sometime between 5:00 and 6:00 a.m. when they heard defendant and Angela arguing in their bedroom. Defendant and Angela then proceeded downstairs to the living room where Lateefah and Aja followed them and observed them pushing and punching each other. Lateefah picked up Charissa, who was already downstairs. Lateefah testified on cross-examination that she took Charissa from Angela during the fight. Defendant pushed Angela to the floor and dragged her into the kitchen. Lateefah and Aja began crying and tried to pull Angela back but defendant told them to "stop" and "get off." The children stood by the kitchen door while defendant sat on top of Angela, "reached up and got two knives in each hand ... [f]rom a wooden thing sitting on top of the cabinet." At this point, Lateefah was not looking because she was "scared" and "cried over [her] little baby sister." A "couple of seconds" after she saw him grab the knife, she heard Aja scream that "he stabbed her." Aja testified that she *48 saw defendant stab Angela once in the right side of the stomach area and then she screamed and cried. Defendant then turned off the light, told the children to go upstairs, and laid on the floor saying, "I'm blind, "I'm blind." Lateefah asked defendant five times to call the hospital and although he told her that he would, he never did. Lateefah stated that she came downstairs again after 15 minutes and her mother's body was still lying on the kitchen floor and defendant was "asleep on the floor." Lateefah testified on cross-examination that both Angela and defendant had been drinking earlier that day. She stated that her mother was drinking "some malt liquor and some MD 500." Terry Kern, who lives at 46-A Spruce Street, testified that at approximately 3:35 a.m., on April 28, he "heard Angela or someone saying don't do it. Don't do it. Shortly thereafter [he] heard a short scream and then the scream was over."
Lateefah and Aja did not go to school for three or four days and defendant told them to stay upstairs. Lateefah left the house once to get some butter from Lorraine Baker. Angela's body remained on the kitchen floor for approximately two days until Cynthia Skelton's daughter, Sadequa (aged 16 at the time of trial) came over to visit. Just before Sadequa arrived, defendant "stuffed" Angela's body in the downstairs closet. Aja watched as defendant put her mother's body in the closet. Defendant told Lateefah what he had done. When Sadequa arrived, defendant took Aja to the store and told Lateefah and Sadequa to go upstairs. He told Lateefah not to say anything to Sadequa.
Lorraine Baker testified that on April 28, 1988 (the day of the stabbing) she was supposed to meet Angela at 9:00 a.m., and when Angela didn't arrive, she attempted to ring the doorbell throughout the day, but there was no answer. The next day, at approximately 3:00 p.m., defendant arrived at Baker's apartment. Baker asked where Angela had been and defendant responded that he and the children had gone to the movies and that Angela had gone to the clinic. Defendant then asked if *49 Angela was at Baker's apartment and Baker said no. At this point, Sadequa (who was already at Baker's apartment) and Baker tried calling Angela's mother to see if she was at her house. Sadequa then left with defendant. Baker made repeated attempts to see if Angela was home but on each occasion defendant came to the door and said she was not home. One time, Baker saw defendant standing between the buildings. Defendant asked Baker to tell Angela that they were home, if she called. Baker did not see Lateefah and Aja until the morning of April 30, 1988 when she borrowed Angela's car to go food shopping. That afternoon, defendant asked Baker to borrow some butter. Before she had a chance to bring it over, defendant sent Lateefah to the house to get it. When Lateefah got there, she showed Baker her arm and said she had ringworm and that that was why she was out of school.
At approximately 2:00 a.m. on Sunday, May 1, 1988, Baker went to Angela's apartment because Angela's mother, Cynthia Skelton, her husband, and Sadequa had come by looking for Angela. Angela's mother testified that she had been trying to get in touch with Angela since she last saw her. After a couple of days, Skelton called her to say that Angela was missing. When they arrived, defendant answered the door, putting his clothes on as he did so. When Angela's mother asked him where Angela was, he first said that she went to the doctor and hadn't returned; next he stated that she was at her girlfriend's; and when the mother didn't believe him, he stated that he didn't know where she was. Angela's mother threatened to call the police. Skelton told Sadequa to go upstairs and get the children because she was taking them with her. Angela's mother began to search the apartment while defendant continued to get dressed. She also asked Lateefah and Aja where their mother was and they responded that they did not know. She found Angela's coat, handbag and shoes behind the sofa in the living room and then went upstairs and asked Aja again where her mother was. Aja told her that Angela was in the downstairs closet. She started to search the closet and defendant ran out *50 of the apartment. She found Angela's body piled under things in the closet. Baker's father-in-law, Jerome Baker, called the police. Lateefah and Aja were taken to stay with Cynthia Skelton and her husband.
Officer Howard Adams was the desk officer at the Franklin Street police station on May 1, 1988. He testified that at approximately 3:00 a.m., defendant entered the police station and stated that:
[H]e was walking past [46-D] Spruce Street when he found at that location, he found a door slightly opened. He went inside and he discovered a Miss Angela Gaines lying down on the kitchen floor with blood coming from the mouth area. He further stated that there were some kids inside crying so he removed the kids to a Lorraine's house.... He stated that Miss Gaines was an old friend of his and he just stopped by for a visit.
Officer Adams dispatched a radio car to the location, made a report of the conversation and asked a detective, Detective Blue, to investigate.
Detective William Thomas of the Newark Police Homicide Squad responded to 46-D Spruce Street at approximately 3:30 a.m. When he arrived, he found the family of Angela Gaines in the apartment and Angela's body in the closet. He also observed blood on the floor and walls of the apartment and seized a butcher block that contained five utensils.
Meanwhile, defendant spoke to Detective Curtis A. Blue in the Newark Police Department Night Detective Bureau. Detective Blue testified that he spoke first and asked defendant, "what's the problem?" Defendant responded, "I want to get this off my conscience. I killed my wife." Detective Blue advised defendant of his Miranda rights and then, according to Detective Blue, defendant "further stated he knew his rights and that he wanted to clear his conscience and that he killed his wife." Defendant told the detective that he killed his wife on April 28, 1988 and that her body could be found at 46-D Spruce Street in the closet. He told the detective that her name was Angela Gaines and that he had stabbed her to death. Detective Blue read him his Miranda rights again and once he verified *51 that a homicide had taken place at 46-D Spruce Street, placed defendant under arrest.
When Detective Thomas returned to the police station, he read defendant his rights; defendant waived his rights and gave a formal statement. When asked what happened to Angela Gaines, defendant stated:
I had laid down and went to sleep and she came upstairs and started screaming at me about her car. I told her it was in the back. I was drunk at the time, I had drunk a half of a fifth of Mad Dog 20/20 and a six-pack of beer. Then she started scratching me on the side of my face. While I was asleep, she had thrown beer across the bed on me. I told her to calm down, the car was in the back. Then she started getting really frantic and grabbed up the baby, Charisa, and started towards the door.
She had her coat on. When she comes drunk, she always grabs Charisa. I told her to put Charisa down and I called my oldest daughter and told her to take Charisa. She wouldn't let my daughter go, so I grabbed her wrist and took the baby from her.
I held her arms up and my daughter, Lateefah, took the baby and went upstairs.
Further, he stated to the detective:
It was Thursday morning, April 28th, 1988. She was already drunk from about ten p.m. that night. After Lateefah took the baby from her, I told her I was tired of this. Ever since the baby was born, all we do is argue. Then something just snapped in my head. She was already on the ground.
I don't know if she had slipped or not, but there was some knives on the floor. Then I went into the living room and laid on the floor.
He added that, "since March 16th, she would always come in the house drunk and argue everyday." When asked if the statement was the truth, defendant responded, "Yes, it wasn't intentional. Something just snapped in my head."
An autopsy revealed that the cause of Angela's death was a stab wound to the right anterior chest with hemorrhage. Dr. Karabi Sinha, the pathologist who performed an autopsy on Angela, testified that he observed two other slits in Angela's sweater and jacket which did not "match" the body wound. The autopsy also revealed that Angela had no defense wounds on her hands or forearms. The toxicology report revealed that Angela Gaines had a blood alcohol content of .22 at the time of death and that there was "some amount of cocaine in the *52 blood." (.02 milligram per liter). Based on the foregoing evidence, the jury found defendant guilty on all counts of the indictment. Defendant made a motion for a new trial which was denied.
The State made a pretrial motion to allow Aja and Lateefah to testify by way of closed circuit television. The motion was made pursuant to N.J.S.A. 2A:84A-32.4 which provides:
a. In prosecutions for aggravated sexual assault, sexual assault, aggravated criminal sexual contact, criminal sexual contact, or child abuse, or in any action alleging an abused or neglected child under P.L. 1974, c. 119 (C. 9:6-8.21 et seq.), the court may, on motion and after conducting a hearing in camera, order the taking of the testimony of a witness on closed circuit television at the trial, out of the view of the jury, defendant, or spectators upon making findings as provided in subsection b. of this section.
b. An order under this section may be made only if the court finds that the witness is 16 years of age or younger and that there is a substantial likelihood that the witness would suffer severe emotional or mental distress if required to testify in open court. The order shall be specific as to whether the witness will testify outside the presence of spectators, the defendant, the jury, or all of them and shall be based on specific findings relating to the impact of the presence of each.
c. A motion seeking closed circuit testimony under subsection a. of this section may be filed by:
(1) The victim or witness or the victim's or witness's attorney, parent or legal guardian;
(2) The prosecutor;
(3) The defendant or the defendant's counsel; or
(4) The trial judge on the judge's own motion.
d. The defendant's counsel shall be present at the taking of testimony in camera. If the defendant is not present, he and his attorney shall be able to confer privately with each other during the testimony by a separate audio system.
e. If testimony is taken on closed circuit television pursuant to the provisions of this act, a stenographic recording of that testimony shall also be required. A typewritten transcript of that testimony shall be included in the record on appeal. The closed circuit testimony itself shall not constitute part of the record on appeal except on motion for good cause shown.
The trial judge held a hearing at which the State offered the testimony of Susan Esquilin, Ph.D who was received by the court as an expert in the field of child psychology. Dr. Esquilin opined that the children would suffer severe emotional or mental distress if required to testify in open court. The trial *53 judge ruled that defendant's right to confrontation under the United States and New Jersey constitutions would not be violated by permitting the prospective child witnesses to testify by way of closed circuit television; that the statute, "as a rule of evidence, [did] not supplant preexisting decisional law concerning the protection of children in the court atmosphere;" and that the children fell within the protection of the statute. The judge also concluded that based on the expert testimony, "the State ... met its burden of establishing by clear and convincing evidence that there is a substantial likelihood that" Aja and Lateefah "would suffer either severe emotional or mental distress if required to testify in the presence of the defendant in open court concerning" the death of Angela Gaines.
Pursuant to this ruling, Lateefah and Aja were permitted to testify on closed circuit television in the judge's chambers with both counsel present. The live testimony was simultaneously transmitted orally and visually to both the jury and defendant. Defendant was located in another judge's cell block with a monitor and a second attorney to assist in securing the right of cross-examination. The jury was given the impression that defendant was in chambers with the witnesses during the examination.

II
The right of an accused to be confronted by the witnesses against him is protected by the Sixth Amendment to the United States Constitution and by the Constitution of New Jersey. U.S. Const. amend VI; N.J. Const. art. I, ¶ 10; see also, State in the Interest of B.F., 230 N.J. Super. 153, 158, 553 A.2d 40 (App.Div. 1989); State v. Washington, 202 N.J. Super. 187, 191, 494 A.2d 335 (App.Div. 1985). The Sixth Amendment provides two types of protection for a criminal defendant: "`the right physically to face those who testify against him, and the right to conduct cross-examination.'" Coy v. Iowa, 487 U.S. 1012, 1017, 108 S.Ct. 2798, 2801, 101 L.Ed.2d 857, 864 (1988) (quoting *54 Pennsylvania v. Ritchie, 480 U.S. 39, 51, 107 S.Ct. 989, 998, 94 L.Ed.2d 40, 53 (1987)). "[T]here is something deep in human nature that regards face-to-face confrontation between accused and accuser as `essential to a fair trial in a criminal prosecution.'" Coy v. Iowa, 487 U.S. at 1017, 108 S.Ct. at 2801, 101 L.Ed.2d at 865 (quoting Pointer v. Texas, 380 U.S. 400, 404, 85 S.Ct. 1065, 1068, 13 L.Ed.2d 923, 926 (1965)).
In Coy, supra, the Supreme Court held that a defendant's right to confrontation was violated where, in a prosecution for two counts of lascivious acts with a child, the trial court approved the use of a large screen to be placed between defendant and the witness stand during the victims' testimony. (The screen enabled the defendant to see the witnesses but the witnesses could not see him at all.) 487 U.S. at 1020-22, 108 S.Ct. at 2803, 101 L.Ed.2d at 866-67. The Court rejected the State's argument that the procedure was sanctioned by a statute which created a presumption of trauma to the child and held that defendant's right to confrontation was violated where there had been no individualized findings that the particular victims needed special protection. Id. at 1021, 108 S.Ct. at 2803, 101 L.Ed.2d at 867. Noting that "a literal meaning of the [Confrontation] Clause" yields "a right to meet face to face all those who appear and give evidence at trial," id., at 1021, 108 S.Ct. at 2803, 101 L.Ed.2d at 867 (quoting California v. Green, 399 U.S. 149, 175, 90 S.Ct. 1930, 1943-44, 26 L.Ed.2d 489, 506 (1970) (emphasis in original)), Justice Scalia specifically stated: "We leave for another day, however, the question whether any exceptions exist. Whatever they may be, they would surely be allowed only when necessary to further an important public policy." 487 U.S. at 1021, 108 S.Ct. at 2803, 101 L.Ed.2d at 867.
That day came in 1990 when the Supreme Court had an opportunity to face the question of exceptions in Maryland v. Craig, 497 U.S. 836, 110 S.Ct. 3157, 111 L.Ed.2d 666 (1990). There, the Court rejected a Sixth Amendment challenge to a Maryland statute which permitted an alleged victim of child *55 abuse to testify at trial out of the presence of the judge, jury, and defendant, via one-way closed-circuit television. Similar to N.J.S.A. 2A:84A-32.4, the Maryland statute required that the trial judge first make particularized findings that the child would suffer "serious emotional distress such that the child cannot reasonably communicate" if compelled to testify in front of the defendant. 497 U.S. at ___, 110 S.Ct. at 3161, 111 L.Ed.2d at 675. In upholding the constitutionality of the Maryland statute, the Court identified face-to-face confrontation as "`the core of the values furthered by the Confrontation Clause,'" id. at ___, 110 S.Ct. at 3164, 111 L.Ed.2d at 679 (quoting California v. Green, supra, 399 U.S. at 157, 90 S.Ct. at 1934, 26 L.Ed.2d at 496), but recognized nonetheless an exception to the face-to-face requirement in certain limited circumstances: "a defendant's right to confront accusatory witnesses may be satisfied absent a physical, face-to-face confrontation at trial only where denial of such confrontation is necessary to further an important public policy and only where the reliability of the testimony is otherwise assured." Id. 497 U.S. at ___, 110 S.Ct. at 3166, 111 L.Ed.2d at 682 (citations omitted). Thus, Maryland's statutorily enunciated interest in safeguarding the physical and psychological well-being of child abuse victims was viewed as outweighing defendant's right to face-to-face confrontation where a finding of necessity was made by the trial court. Id. at ___, 110 S.Ct. at 3168-69, 111 L.Ed.2d at 684-85. Such a procedure "ensures the accuracy of the testimony and preserves the adversary nature of the trial." Id. at ___, 110 S.Ct. at 3169, 111 L.Ed.2d at 686. Based on Craig, the constitutionality of N.J.S.A. 2A:84A-32.4 was affirmed in State v. Crandall, 120 N.J. 649, 577 A.2d 483 (1990).
In this case, the trial judge determined that the facts brought the witnesses within the intendment of N.J.S.A. 2A:84A-32.4 which prescribes that: "In prosecutions for aggravated sexual assault, sexual assault, aggravated criminal sexual contact, criminal sexual contact, or child abuse, or in any action alleging an abused or neglected child ...," the court may *56 permit the taking of testimony from child witnesses via closed circuit television. Defendant argues that this holding contravenes the statute. We agree. When a statute is unambiguous on its face, a court need not look beyond its terms to divine the Legislature's intent. State v. Churchdale Leasing, Inc., 115 N.J. 83, 101, 557 A.2d 277 (1989); State v. Butler, 89 N.J. 220, 226, 445 A.2d 399 (1982). To be sure, there are cases in which something in the character or context of the legislation justifies according it a different meaning than would result from a literal reading. Swiney v. Dept. of Treasury, Div. of Pensions, 84 N.J. Super. 186, 192, 201 A.2d 392 (App.Div. 1964). Here, however, there is nothing to suggest that a literal reading of N.J.S.A. 2A:84A-32.4 would not be "responsive to the essential principle[s] of the law." Alexander v. New Jersey Power & Light Co., 21 N.J. 373, 378, 122 A.2d 339 (1956).
The trial judge's conclusion as to the applicability of the statute is unwarranted because none of the enumerated offenses was involved; the children were not victims, and this was a murder prosecution not an action alleging abuse or neglect. Moreover, the legislative history of N.J.S.A. 2A:84A-32.4 indicates that its purpose is "to spare a youthful witness the ordeal of repeatedly discussing details of sexual assault or abuse," no more and no less. Senate Judiciary Committee Statement to L. 1985, c. 126. See also State v. Crandall, supra, 120 N.J. at 651, 577 A.2d 483 ("[a] stated purpose of the statute is to protect young victims of criminal abuse from the effects of testifying in open court in the presence of the accused."). Thus, the Legislature clearly identified those cases in which a defendant's right to confrontation would give way to the need to protect child victims. If the Legislature had intended to include within the statute's protection to all cases involving potential trauma to child witnesses, it could easily have done so. Its omission speaks eloquently to the scope of the statutory coverage which plainly does not extend to this case. "[W]hen all the world can see what sensible legislators in such a contingency would wish that we should do, we are not to *57 close our eyes as judges to what we must perceive as men." N.J. Turnpike Employees Union v. N.J. Turnpike Auth., 200 N.J. Super. 48, 53, 490 A.2d 338 (App.Div.) (quoting People v. Knapp, 230 N.Y. 48, 63, 129 N.E. 202, 208 (1920) (Cardozo, J.), cert. denied, 256 U.S. 702, 41 S.Ct. 624, 65 L.Ed. 1179 (1921)), certif. denied, 101 N.J. 294, 501 A.2d 954 (1985).
The trial judge ruled alternatively that the statute "does not supplant pre-existing decisional law concerning the protection of children in the court atmosphere." In like vein, the State here urges that notwithstanding the statutory limits, the trial judge's particularized findings that the denial of confrontation was necessary to further an important public policy met the standard of Maryland v. Craig, supra. Like the State, we agree that theoretically a policy interest sufficient to outweigh the right to physical confrontation may exist without the formality of statutory codification. However, when the Legislature has considered the issue of the protection of child witnesses and has delineated with precision those limited circumstances which, upon appropriate findings, will prevail over a defendant's right to face-to-face confrontation, that is the expression of the public policy of this state. We are not free to engraft onto it our own vision of what our public policy is, or should be. As the United States Supreme Court in Craig noted: "we will not second-guess the considered judgment of the [Maryland] Legislature regarding the importance of its interest in protecting child abuse victims from the emotional trauma of testifying." Maryland v. Craig, supra, 497 U.S. at ___, 110 S.Ct. at 3169, 111 L.Ed.2d at 685.
Nothing in State v. Bass, 221 N.J. Super. 466, 535 A.2d 1 (App.Div. 1987), certif. denied, 110 N.J. 186, 540 A.2d 182 (1988) which reviewed proceedings prior to the enactment of N.J.S.A. 2A:84A-32.4 suggests an opposite result. There we were not constrained by any statute. Nevertheless, we took pains to explain that the facts of that case which involved allegations of *58 child abuse against the murder victim would fall within the provisions of the later enacted N.J.S.A. 2A:84A-32.4.
Further, we take our direction from the Supreme Court decision in State v. D.R., 109 N.J. 348, 537 A.2d 667 (1988) where the Court refused to sanction our creation of a new exception to the hearsay rule under Evid.R. 5 which "would allow into evidence, under certain conditions, testimony of out-of-court statements made by a young child relating acts of sexual abuse." Id. at 357, 537 A.2d 667. Although the Court approved of the "tender years exception," it reversed on the grounds that the adoption of such a rule by judicial fiat is inappropriate. Id. at 375-76, 537 A.2d 667. Like the Supreme Court in D.R., we might well prefer a rule granting protection to child-witnesses in a more expansive class of cases, but we recognize that it is not for us to amend by judicial fiat the Legislature's statement of public policy on the subject. We thus reverse and remand this case for retrial at which Aja and Lateefah will, if called to testify, be present in the courtroom.

III
This ruling makes it unnecessary for us to address the other issues raised by defendant. Nevertheless, we add these brief comments. On the remand, the trial judge should carefully assess the evidence adduced in light of defendant's claimed entitlement to an instruction on aggravated and reckless manslaughter and intoxication.
It is well-settled that where the facts "clearly indicate" a rational basis on which to support a conviction of a lesser-included offense of the crime of murder, a trial court is obliged to instruct the jury as to the lesser-included offense even where not requested. State v. Choice, 98 N.J. 295, 299, 486 A.2d 833 (1985) (quoting State v. Powell, 84 N.J. 305, 318, 419 A.2d 406 (1980)). "[E]ven very slight evidence on that theory will compel the instruction on a lesser offense." State v. Bohannan, 206 N.J. Super. 646, 649, 503 A.2d 396 (App.Div. 1986) (citing State v. Powell, supra, 84 N.J. at 317, 419 A.2d 406). As recently as *59 State v. Purnell, 126 N.J. 518, 601 A.2d 175 (1992), the Supreme Court reiterated the trial court's duty to instruct the jury as to the lesser-included offense of manslaughter where the facts "`clearly indicate' the appropriateness of that charge." Id. at 541, 601 A.2d 175 (citation omitted).
When the lesser-included offense charge is requested by a defendant, as in this case, the trial court is obligated, in view of defendant's interest, to examine the record thoroughly to determine if the rational-basis standard has been satisfied. [State v. Crisantos (Arriagas), 102 N.J. 265, 278, 508 A.2d 167 (1986) (citing State v. Powell, supra, 84 N.J. at 318-19, 419 A.2d 406; State v. Choice, supra, 98 N.J. at 298-99, 486 A.2d 833)].
We think the evidence, as presented, which included a fight fueled by alcohol, no indication of pre-planning, a single stab wound and an allegation by defendant that he "snapped" was adequate to provide a rational basis for the lesser included aggravated and reckless charges. Likewise, there was evidence of significant alcohol use by defendant from Lateefah and from defendant himself (he said he drank one-half of a fifth of Mad Dog 20-20 and a sixpack of beer), of bizarre actions ("I am blind," "sleeping" next to the dead body) and of memory loss to present a jury question as to whether defendant's faculties were so prostrated that he was incapable of forming an intent to commit the crime of murder. State v. Mauricio, 117 N.J. 402, 418, 568 A.2d 879 (1990).
We also note that, on this record, defendant's conviction for possession of a knife for an unlawful purpose should have merged with his conviction for murder. There is simply nothing in this case to support the conclusion that defendant possessed the knife other than to stab Angela or that his unlawful purpose was anything broader than Angela's murder. Nor did the jury so find. State v. Williams, 213 N.J. Super. 30, 36-37, 516 A.2d 265 (App.Div. 1986), certif. denied, 107 N.J. 104, 526 A.2d 177 (1987). We caution that the foregoing comments arise solely out of this record and that at a different trial a different result may be appropriate on some or all of these matters.
We note as well that the trial judge here mistakenly failed to instruct the jury on its duty to determine if defendant's *60 statement to the police was credible. Evid.R. 8(3); State v. Hampton, 61 N.J. 250, 294 A.2d 23 (1972). Nothing in the charge, taken as a whole, can be viewed as ameliorating this error which is conceded by the state and which could have affected the outcome here. Because the case is to be retried, we need not comment further.
The trial judge also erred in refusing to allow defendant the opportunity to exercise peremptory challenges when, after 14 jurors were chosen and accepted by both sides but not sworn, one juror announced that he could not be impartial. The excusal of that juror and his replacement essentially changed the complexion of the jury and warranted reopening of voir dire to the extent that either side had peremptory challenges available and for so long as either side was in a position to exercise a challenge for cause. This is an important point. The trial judge's action here could well have led us to the conclusion that defendant's right to a fair and impartial jury was compromised.
Reversed and remanded for a new trial.