265 N.J. Super. 528 (1993)
628 A.2d 346
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
PEDRO VASQUEZ, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued May 3, 1993.
Decided May 27, 1993.
*532 Before Judges J.H. COLEMAN, SHEBELL and CONLEY.
J. Michael Blake, Assistant Deputy Public Defender, argued the cause for appellant (Zulima V. Farber, Public Defender, attorney; Mr. Blake, of counsel and on the brief and reply brief).
Catherine A. Foddai, Deputy Attorney General, argued the cause for respondent (Robert J. Del Tufo, Attorney General, attorney; Ms. Foddai, of counsel and on the brief).
The opinion of the court was delivered by SHEBELL, J.A.D.
Defendant, Pedro Vasquez, appeals his jury convictions of murder (N.J.S.A. 2C:11-3a(1), (2)) and third-degree possession of a weapon for an unlawful purpose (N.J.S.A. 2C:39-4d). He also appeals the sentence imposed of life imprisonment with a thirty-year *533 parole ineligibility term on the murder conviction and the concurrent term of three years on the possession of a weapon for an unlawful purpose conviction.
This case involves the death of defendant's girlfriend, whose death was reported to the police by defendant's cousin, Raphael Freire. Defendant and the victim lived together in an apartment in Newark. Defendant's sole theory throughout the trial was that Freire, not defendant, killed her.
Defendant's cousin, Freire, testified that on February 29, 1988, he received a phone call from defendant. Defendant claimed there was an emergency and that he needed Freire to come to his home. Later, defendant told his cousin that he was having problems with his girlfriend. Freire recommended that defendant leave her if the situation was bad. On cross-examination, Freire testified that defendant told him she wanted to leave defendant.
The next day defendant allegedly came to Freire's home at approximately 10:00 p.m. and requested that Freire take him home. When they arrived at defendant's home, he told Freire he needed a "big favor." He wanted to borrow Freire's car because he had to throw something away. Freire told defendant to wait for the regular garbage removal, but defendant said he could not wait. Freire would not loan defendant the car, but agreed to help him.
Defendant made two trips into the apartment and returned with several small, dark-colored garbage bags, which he put in the trunk of Freire's car. Defendant then asked Freire to drive him to several different locations. At the various locations, Freire would park the car, and defendant would dispose of a bag nearby. Freire asked defendant what was in the bags, but defendant would not tell him. After they made the last stop, Freire testified that the following discussion occurred.
He [defendant] said "That was [the victim] in the bag," and I said "What you mean [the victim]?" He said "I killed her." I said "[Defendant], why you do that for?" He says "I just got mad at her, we had an argument and she tried to stab me," And he then showed me like a little wound on his arm.

*534 ....
He said that she tried to stab him with a knife so then he grabbed her by the throat, he hit her, knocked her down, then he said he had stabbed her, then he said he dragged her in the bathroom, he took off all his clothing and he started just cutting her.
....
He had told me he put them [pieces of the victim's body] in the refrigerator, he had put them in the refrigerator and left them there overnight and then he came to pick me up that Tuesday.
Freire testified that he did not go directly to the police because defendant was his cousin, and Freire "had so much faith in him." Freire cleaned out the trunk of his car prior to reporting the events to the police. Freire claimed that defendant used defendant's mother's car to dispose of the "big portion" of the body.
The medical examiner who conducted the autopsy stated that the cause of death was asphyxia by strangulation. The body revealed small hemorrhages over the eyelids and face as well as scars on the neck which were compatible with fingernails. The victim had also suffered a stab wound to the left side of her chest. Although this wound entered the chest, it did not puncture her lung. The stab wound was also listed as a potential cause of death. The medical examiner offered his opinion that the victim died prior to being dismembered.
Various evidence recovered from defendant's apartment revealed the following. Human flesh was discovered on the bedroom floor. Dried blood was found on the back of a door jamb. An area near the bathroom tub drain and also the drain screen tested positive for blood. A swab taken from the trunk of a car registered to defendant also tested positive for blood.
The victim's sister testified that on February 28 or 29, 1988, her sister told her she wanted to leave defendant and return home to live. On February 29, she spent at least part of the day with the victim. They arrived at their mother's house at approximately 5:00 p.m. Defendant was there when they arrived, and the sister testified that, "[T]hey were sitting in the chair and the next thing *535 I know he [defendant] jumped up and he had a knife in his hand and he pushed her out of the way and then he ran out of the house." The knife was approximately eight inches long.
Defendant was arrested on March 4, 1988. He had a minor bruise around his left eye and a minor scratch on his right shoulder. There were also small scratches on one of his fingers and on his wrist.
Defendant testified that when he arrived home on the afternoon of February 29 after visiting the victim's mother's residence, he attempted to repair the washing machine which was located next to the bathroom. At around 6:00 p.m., he noticed that it was getting dark outside and decided to find his girlfriend. Defendant walked around the neighborhood. As he was returning but still two houses away from his residence, he saw Freire coming down the stairs. Defendant did not enter the house because Freire told him that his girlfriend was not home.
Defendant, Freire, and Freire's five-year old son went to a local bar where they had a few drinks. After a short time, all three returned to defendant's residence. Freire stated that he was coming inside, but left his son in the back seat of the car. When they entered the apartment, defendant saw the victim laying on the couch, undressed from the waist down. Defendant stated that he called out to her, but she did not respond. He said he noticed "[f]oam coming out of her nose." Freire then told him that she was dead.
Defendant claimed he started yelling, and Freire punched him in the chest and told him to "shut up." When defendant said they should call the police, Freire told him not to. "[H]e said if I called the police they're not going to believe me because it happened in my house."
Freire then allegedly began "grabbing" the body and dragged it from the living room to the bedroom. Freire went out to his car to retrieve something and returned to the bedroom. Freire was in the bedroom for some time, and then walked into the living *536 room carrying a long knife, approximately fourteen to eighteen inches long. Freire touched defendant's shoulder with the knife, and they walked into the bedroom. When they got near the bathroom, Freire insisted that defendant take the knife, which he did.
When defendant walked into the bathroom, he noticed the victim's face in the tub, and then saw that her left arm was missing. He testified he ran from the bathroom and tried to leave the apartment, but Freire stopped him by holding the knife at him. Defendant stayed in the living room while Freire returned to the bathroom. After some time Freire asked defendant if he had any bags. Freire eventually came out of the bathroom carrying one bag. They then left the house and went to the car. They drove around for a while, and Freire told defendant that he could not tell anyone what happened. Freire gave defendant five dollars and then dropped him off in front of defendant's house.
Defendant testified that he walked the streets all night and did not reenter his residence until the next afternoon. That night defendant went to Freire's house. They returned to defendant's apartment, and Freire started "pulling bags out of the freezer." Defendant claimed that they carried a total of six bags to the trunk of Freire's car.
They began driving around and when they reached an area near Avenue P, Freire insisted that defendant get a bag from the trunk. Defendant threw the bag into the weeds. The same thing happened at several other locations. At the various sites, either defendant or Freire would throw the bags out. At one point, they were pulled over by the police, and defendant merely asked for directions.
On cross-examination, defendant testified that he did nothing to ascertain whether his girlfriend was actually dead when he saw her on the couch. He did not check her, or call any medical personnel. Defendant denied ever using his mother's car. When asked about the injuries he had at the time of his arrest, defendant claimed that the victim cut him on the wrist with his knife *537 while they were at her mother's house, but that they were only "playing." Defendant claimed that he and the victim planned to be married on April 2, 1988.
The only other person to testify on defendant's behalf was Edward Norton. Norton testified that he was with defendant and the victim on February 29, 1988 at approximately 6:30 a.m. They had been at a local bar the night before and went to Norton's house when the bar closed. Norton had been a printer for fourteen years, and while they were at his house, he showed defendant and his girlfriend wedding invitations.
In his brief on appeal defendant raises the following legal arguments:

POINT I: BY FAILING TO GIVE AN INSTRUCTION ON PASSION/PROVOCATION MANSLAUGHTER WHEN ASKED BY THE JURY TO EXPLAIN MURDER AND AGGRAVATED MANSLAUGHTER, THE TRIAL COURT DEPRIVED DEFENDANT OF DUE PROCESS UNDER THE FOURTEENTH AMENDMENT AND OF HIS RIGHT TO A FAIR TRIAL UNDER OUR STATE CONSTITUTION. (NOT RAISED BELOW).

POINT II: DEFENDANT WAS DENIED A FAIR TRIAL AND DUE PROCESS OF LAW IN VIOLATION OF THE FOURTEENTH AMENDMENT AND THE STATE CONSTITUTION BY THE VERDICT SHEET WHICH THE COURT SUPPLIED TO THE JURY FOR THEIR DELIBERATIONS. THE VERDICT SHEET AND THE COURT'S ORAL INSTRUCTIONS REGARDING THE VERDICT SHEET EFFECTIVELY PREVENTED THE JURY FROM CONSIDERING A VERDICT OF PASSION/PROVOCATION MANSLAUGHTER. (NOT RAISED BELOW).

POINT III: THE COURT'S FAILURE TO INSTRUCT THE JURY ON SELF-DEFENSE DEPRIVED DEFENDANT OF DUE PROCESS UNDER THE FOURTEENTH AMENDMENT AND OF HIS RIGHT TO A FAIR TRIAL UNDER OUR STATE CONSTITUTION. (NOT RAISED BELOW).

POINT IV: THE TRIAL COURT'S FAILURE TO CHARGE THE JURY AS TO THE IMPACT OF IMPERFECT SELF-DEFENSE ON THE MURDER CHARGE DEPRIVED DEFENDANT OF DUE PROCESS UNDER THE FOURTEENTH AMENDMENT AND OF HIS RIGHT TO A FAIR TRIAL UNDER OUR STATE CONSTITUTION. (NOT RAISED BELOW).

POINT V: THE DEFENDANT WAS DENIED DUE PROCESS AND A FAIR TRIAL IN VIOLATION OF THE FOURTEENTH AMENDMENT AND THE STATE CONSTITUTION BY THE ADMISSION OF HEARSAY EVIDENCE REGARDING THE DECEDENT WHICH WAS UTILIZED BY THE STATE TO DEMONSTRATE DEFENDANT'S MOTIVE. (NOT RAISED BELOW).

*538 POINT VI: DEFENDANT WAS DENIED A FAIR TRIAL AND DUE PROCESS IN VIOLATION OF THE FOURTEENTH AMENDMENT AND THE STATE CONSTITUTION BY THE ADMISSION WITHOUT ANY LIMITING INSTRUCTION OF THE ENTIRE STATEMENT WHICH THE STATE'S CRUCIAL WITNESS GAVE TO THE POLICE. (NOT RAISED BELOW).

POINT VII: DEFENDANT WAS DENIED A FAIR TRIAL AND DUE PROCESS OF LAW IN VIOLATION OF THE FOURTEENTH AMENDMENT AND THE STATE CONSTITUTION BY THE FAILURE OF THE TRIAL COURT TO INSTRUCT THE JURY THAT THE DEFENDANT'S PRE-ARREST SILENCE WAS RELEVANT ONLY AS TO HIS CREDIBILITY. (NOT RAISED BELOW).

POINT VIII: NUMEROUS INSTANCES OF PROSECUTORIAL MISCONDUCT DEPRIVED THE DEFENDANT OF HIS DUE PROCESS RIGHT TO A FAIR TRIAL. (U.S. CONST. AMEND. XIV; N.J. CONST. (1947), ART. I, PARA. 1). (PARTIALLY RAISED BELOW).

POINT IX: DUE PROCESS REQUIRES THAT DEFENDANTS CASE BE REMANDED FOR A NEW SENTENCING HEARING INASMUCH AS THE EXTANT RECORD DOES NOT AFFORD THE BASIS FOR A MEANINGFUL APPEAL.

POINT X: THE TRIAL COURT ERRED IN IMPOSING A LIFE SENTENCE AND IN FAILING TO MERGE THE DEFENDANT'S CONVICTION FOR POSSESSION OF A WEAPON FOR AN UNLAWFUL PURPOSE INTO HIS CONVICTION FOR MURDER.

I.
Defendant contends that his due process rights and his right to a fair trial were violated because the trial court failed to provide an instruction on passion/provocation manslaughter when the jury asked for an additional charge on murder and aggravated manslaughter. Defendant further contends that the trial court erred in its initial charge by instructing on the elements of murder first and then subsequently charging passion/provocation manslaughter. Defense counsel made no objection to either.
The court instructed the jury on murder as follows:
Murder is defined as the unlawful killing of one person by another purposely or knowingly. A person who commits a killing does so purposely when it is his conscious object to cause death or serious bodily injury resulting in death.
A person who commits a killing does so knowingly when he is aware that what he is doing will cause death or serious bodily injury resulting in death or is practically certain to cause death or serious bodily injury resulting in death.

*539 ....
You will note that I have used the words "purposely" and "knowingly." The nature of the purpose or knowledge with which the Defendant acted towards the decedent is a question of fact for you the jury to decide.
....
The essential determination for you to make in regard to the charge of murder is whether the Defendant committed the killing purposely or knowingly as I have defined these terms for you.
In order for you to find the Defendant guilty of murder the State must first establish beyond a reasonable doubt that the killing of the decedent was committed by the Defendant and was done purposely or knowingly as I have defined these terms for you.
....
If after a consideration of all the evidence you are convinced beyond a reasonable doubt that the Defendant either purposely or knowingly caused the death of the victim and the State has also proved beyond a reasonable doubt the absence of what's called reasonable provocation as I shall later define for you, then the State has established the elements necessary for a murder conviction. [Emphasis added.]
The court, after instructing on murder, next gave a full instruction on the elements of aggravated manslaughter. The court then returned to its discussion of passion/provocation manslaughter:
Now, as I told you before, when I charged murder, the elements I mentioned as to knowingly or purposely, the State must also prove beyond a reasonable doubt the absence of reasonable provocation. I will explain that further to you and how that applies to murder.
The homicide which would otherwise be murder is manslaughter when the killing is committed in the heat of passion resulting from a reasonable provocation. In this connection you must keep in mind that provocation in law has a fixed meaning. If there was provocation of such character as is recognized by the law and it was acted upon under circumstances which the law recognizes then the crime is manslaughter.
The court defined the elements which constitute passion/provocation manslaughter. The court then stated:
If you are not satisfied beyond a reasonable doubt that the Defendant did in fact cause the victim's death or the Defendant acted purposely or knowingly then you must find the Defendant not guilty of murder.

If you are satisfied beyond a reasonable doubt that the Defendant knowingly or purposely caused the victim's death but you have a reasonable doubt as to whether *540 he did so in the heat of passion upon reasonable provocation, then you must find the Defendant guilty of manslaughter.

If you are convinced beyond a reasonable doubt that the Defendant knowingly or purposely caused death or serious bodily injury resulting in death without acting in the heat of passion upon reasonable provocation, you must find the Defendant guilty of murder.

In addition to the State's obligation to prove the elements of knowing or purposeful murder the burden is always on the State to prove beyond a reasonable doubt that the actions were not done in the heat of passion or upon reasonable provocation. [Emphasis added.]
At the end of the trial court's charge, defense counsel specifically noted on the record that he had no objection.
During deliberations the jury requested a redefinition of murder and aggravated manslaughter. In response the judge repeated the instructions for murder that he had previously given. The judge then began:
If you also find the State has proved beyond a reasonable doubt the absence of a reasonable provocation as I have already defined for you, if however 
The prosecutor interrupted at this point and asked to be seen at side bar. The prosecutor commented that the jury request "asked for redefinition of murder and aggravated manslaughter. It does not ask for a redefinition of manslaughter, Judge." The court noted the prosecutor's objection, but continued:

If also the State has proved beyond a reasonable doubt that absence of reasonable provocation as I have defined it for you, then the State, of course, has established the elements of murder. If, however, after consideration of all of the evidence you find the State has failed to prove each and every element, your verdict must be not guilty of murder. [Emphasis added.]
The court then redefined aggravated manslaughter but did not redefine passion/provocation manslaughter. At the close of the supplementary instruction, the court again asked counsel if they "wish[ed] to be heard." The prosecutor and defense counsel each responded, "No."
While the law now requires that a trial court provide an instruction on passion/provocation during its initial murder charge where the evidence supports passion/provocation manslaughter, the law was not clear at the time defendant was tried in 1988. The trial court's initial charge on murder referred to the State's *541 burden of disproving heat of passion beyond a reasonable doubt. Thereafter, the court further stressed the State's burden in connection with the passion/provocation manslaughter charge. Again, when giving the supplementary charge, the judge instructed that the jury could not convict of murder unless it found that the State had proven the absence of passion/provocation beyond a reasonable doubt.
The court thereby fully satisfied the requirement of State v. Wilson, 128 N.J. 233, 607 A.2d 1289 (1992).
When the record contains evidence of passion/provocation, a charge that does not include a specific instruction that the State must disprove passion/provocation before the jury can find defendant guilty of murder is fatally flawed  even when the instructions contain general statements concerning the State's burden of proof. [Id. at 240, 607 A.2d 1289.]
See also State v. Coyle, 119 N.J. 194, 222, 574 A.2d 951 (1990) (holding that trial court's instruction mandated a reversal of defendant's conviction; although the court subsequently instructed on passion/provocation, initial charge that jury need not consider manslaughter offenses unless it decided that State did not prove the elements of murder beyond a reasonable doubt "foreclose[d] jury consideration of whether passion/provocation should reduce an otherwise purposeful killing from murder to manslaughter"); State v. Vigilante, 257 N.J. Super. 296, 299, 608 A.2d 425 (App.Div. 1992) (holding that trial court's jury instructions were erroneous because they failed to adequately inform the jury that State had burden of proving beyond reasonable doubt that defendant did not kill in heat of passion).
In State v. Bishop, 247 N.J. Super. 382, 589 A.2d 625 (App.Div. 1991), we addressed the issue of where a charge on passion/provocation must appear in order to satisfy a defendant's constitutional rights. We held that the initial charge on murder "must define the elements of murder to include the `effect of passion/provocation on an otherwise intentional killing.'" Id. at 390, 589 A.2d 625 (quoting Coyle, supra, 119 N.J. at 224, 574 A.2d 951). The absence of passion/provocation is an element of murder which the State must prove beyond a reasonable doubt. Ibid. We held *542 that, viewing the instructions as a whole, the error could not be said to be harmless. Id. at 391, 589 A.2d 625.
In State v. Johnston, 257 N.J. Super. 178, 608 A.2d 364 (App. Div.), certif. denied, 130 N.J. 596, 617 A.2d 1219 (1992), defendant alleged for the first time on appeal that the trial court's instructions on passion/provocation manslaughter required reversal of his conviction. In Johnston, the trial court instructed the jury as follows:
If you are not satisfied beyond a reasonable doubt that the State has proven that the defendant did, in fact, cause the victim's death or that defendant acted purposely or knowingly, then you must find the defendant not guilty of murder.
If you are satisfied beyond a reasonable doubt that the elements of murder have been proved, but have a reasonable doubt as to whether the State has proven that defendant did not act under the stress of reasonable provocation, you must find the defendant not guilty of murder and find him guilty of provocation, passion, manslaughter.

If you are convinced beyond a reasonable doubt that the State proved that the defendant knowingly or purposely caused death or serious bodily injury resulting in death without acting in the heat of passion upon reasonable provocation, then you must find the defendant guilty of murder. [Id. at 201, 608 A.2d 364.]
The court held:
The charge read as a whole accurately set forth the applicable law controlling this case, including the law as to murder and passion/provocation manslaughter. The trial court correctly instructed the jury on the relationship between a purposeful and knowing murder and a homicide committed in the heat of passion and provocation. Contrary to defendant's argument, the trial court made it abundantly clear that if the jury found that defendant acted purposely or knowingly it was required to consider heat of passion and provocation before it could determine whether the crime was murder or manslaughter. This is essentially what is required by State v. Coyle, supra. [Id. at 199, 608 A.2d 364.]
Because the trial court clearly instructed that the State had the burden of proving defendant did not kill in the heat of passion, the charge was held not to amount to plain error. Id. at 201, 608 A.2d 364.
Here, the trial judge did not have the benefit of the more recent cases. Nonetheless, he satisfied the requirement that the definition of murder incorporate an instruction that the State must prove beyond a reasonable doubt the absence of passion/provocation manslaughter where the evidence might support passion/provocation. *543 Bishop, supra, 247 N.J. Super. at 390, 589 A.2d 625. We are satisfied that the initial charge did not possess a clear capacity to bring about an unjust result. See R. 2:10-2; see also State v. Hock, 54 N.J. 526, 538, 257 A.2d 699 (1969) (holding that when no objection has been made to the charge, the appeal will not be considered unless the charge is "sufficiently grievous to justify notice by the reviewing court and to convince the court that of itself the error possessed a clear capacity to bring about an unjust result"), cert. denied, 399 U.S. 930, 90 S.Ct. 2254, 26 L.Ed.2d 797 (1970).
We are also convinced that there was no plain error in the trial judge responding only to the jury's limited request for a redefinition of murder and aggravated manslaughter. Again, his redefinition of murder directly referred to the State's burden under Bishop to disprove passion/provocation manslaughter.

II.
Defendant next alleges that the combination of the trial court's instructions and the verdict sheet prevented the jury from considering whether defendant was guilty of passion/provocation manslaughter. Defendant bases this argument on the fact that the verdict sheet did not "specifically list passion/provocation manslaughter. The verdict sheet only list[ed] second degree manslaughter."
We have previously indicated our position that the instruction clearly advised the jury that it could not convict defendant of murder unless the State proved beyond a reasonable doubt that defendant did not act in the heat of passion. The issue then is whether the verdict sheet and its presentation could have confused the jury regarding its consideration of the elements of passion/provocation manslaughter and the State's burden to disprove it.
The following instructions accompanied the court's presentation of the verdict form to the jury.

*544 Now, members of the jury, for your convenience, I have prepared a verdict form. I will hold it up and if you could see it from there, the CIA would hire you. I have to use bifocals from this point.
The jury verdict form captioned, State of New Jersey vs. Pedro Luis Vasquez, Count one, first degree murder. You circle one, not guilty or guilty.
If you find the Defendant guilty of murder proceed to count two, that's the weapon's count. If you find the Defendant not guilty of murder, then you must consider the following: First degree aggravated manslaughter, circle one, guilty or not guilty.
If you find the Defendant guilty of aggravated manslaughter, proceed to count two, as I said, the weapon's charge. If you find him not guilty of aggravated manslaughter, then you must go to the following, second degree manslaughter, not guilty or guilty, and then count two, third degree unlawful possession of a weapon, circle not guilty or guilty.
The court asked whether counsel for either side had any objections. Neither did.
Prior to the charge, the court and counsel discussed the verdict form:
THE COURT: In reviewing the verdict form I actually feel it would be appropriate either we take out second degree and the words "reckless manslaughter" and actually have two types of second degree manslaughter. Reckless in heat of passion or is it best that I add second degree, passion provocation manslaughter?
[PROSECUTOR]: Well, my thought is, why don't you just take out the word "recklessly" it's second degree manslaughter.
[DEFENSE COUNSEL]: I will agree.
THE COURT: All right, that is the simplest way.
[DEFENSE COUNSEL]: Because leaving reckless or what have you, heat of passion, that gives them  that's fine.
THE COURT: All right, fine.
Thus, it appears the court was inclined to separate manslaughter into reckless and passion/provocation manslaughter on the verdict sheet. However, both counsel agreed to use merely one category  second-degree manslaughter  to encompass both types of manslaughter.
The Court in Coyle, supra, stated that although sequential charges are normally a means of providing order to jury deliberations,
In murder cases in which there is evidence of passion/provocation, however, a court must take additional care in issuing clear instructions. In those cases a sequential charge coupled with an instruction that inadequately defines the elements *545 of the greater offense, namely, murder, can mislead the jury. [Coyle, supra, 119 N.J. at 223-24, 574 A.2d 951.]
In State v. Zola, 112 N.J. 384, 548 A.2d 1022 (1988), cert. denied, 489 U.S. 1022, 109 S.Ct. 1146, 103 L.Ed.2d 205 (1989), the Court noted the problems associated with sequential instructions.
This concept of sequential resolution of available verdicts poses its own internal problems.... The premise is "that it is the duty of the jury not to reach compromise verdicts based on sympathy for the defendant or to appease holdouts, but to render a just verdict by applying the facts to the law as it is charged." ... But in advancing that premise care must be taken to avoid the stratification of thought that would deter a jury from returning the proper available verdict. [Id. at 405-06, 548 A.2d 1022 (citations omitted).]
In Bishop, supra, defense counsel objected to a verdict sheet which listed the possible verdicts as murder, aggravated manslaughter, and manslaughter. Bishop, supra, 247 N.J. Super. at 385, 589 A.2d 625. Defense counsel presented the same argument that is presented here. The verdict sheet would allow the jury to convict defendant of murder before considering passion/provocation which could reduce the charge to manslaughter. Ibid.
However, in Bishop, unlike the present case, the trial court, in its initial charge on murder, never instructed the jury that the State had to prove beyond a reasonable doubt that the defendant did not act in the heat of passion. Id. at 387, 589 A.2d 625. In Bishop, because the initial charge on murder did not include the passion/provocation defense, "the sequential instruction permit[ted] the jury to convict a defendant of murder without any consideration of passion/provocation." Id. at 390, 589 A.2d 625; see also State v. Erazo, 126 N.J. 112, 125-26, 594 A.2d 232 (1991).
In State v. Reed, 249 N.J. Super. 41, 592 A.2d 4 (App.Div. 1991), certif. granted, 127 N.J. 552, 606 A.2d 365 (1992), defendant appealed his conviction on the basis that the trial court failed to properly instruct on passion/provocation. We held that "it is error for a trial court to tell a jury that a defendant must first have been acquitted of murder before they consider whether he acted in the heat of passion resulting from reasonable provocation." Id. at 49, 592 A.2d 4.
*546 In Reed, when the trial court informed the jury that it should consider manslaughter only if they found defendant not guilty of purposeful and knowing murder, the court had not yet mentioned passion/provocation. Ibid. Only after the court instructed on aggravated and reckless manslaughter did the court instruct on passion/provocation manslaughter. Ibid. Although the correct instruction was eventually given, we noted that the verdict sheet still prejudiced defendant.
[W]e agree with the defendant that he was substantially prejudiced by the verdict sheet which the court supplied to the jury for their deliberations. The form should have explicitly given the jury the opportunity to return a verdict with respect to passion-provocation manslaughter. It did not do so. The only manslaughter offenses to which the verdict sheet referred were "the lesser included offense of Aggravated Manslaughter" and "the lesser included offense of Manslaughter." It directed the jury to consider the latter offense only if they found the defendant not guilty of purposeful murder, of knowing murder and of aggravated manslaughter. The court's explanation of the verdict sheet to the jury told them:
Now, only if your answer to both the first count and the second count are not guilty, do you consider the lesser included offenses of aggravated manslaughter and manslaughter.
And only if your determination is not guilty of aggravated manslaughter do you go on to manslaughter.
The effect of the erroneous form of the verdict sheet was to prevent the jury from considering whether the defendant was guilty of passion-provocation manslaughter if they found that, but for his having acted in the heat of passion as the result of reasonable provocation, he would have been guilty of purposeful or knowing murder.... If there was also evidence in the record on the basis of which the jury could have harbored a reasonable doubt whether the defendant killed his victim in the heat of passion as the result of reasonable provocation, the error in the verdict sheet requires reversal of the conviction of knowing murder. [Id. at 50-51, 592 A.2d 4.]
In the present case, although the trial judge did not mention that the jury should consider passion/provocation manslaughter simultaneously with murder when he explained how the jury should proceed through the verdict form, he had instructed the jury three times on the need to consider whether the State had satisfied its burden of disproving beyond a reasonable doubt the presence of passion/provocation manslaughter. Significantly, not only was the jury advised twice before being given the verdict form, but also thereafter during deliberations when it requested a redefinition of murder and aggravated manslaughter.
*547 The verdict sheet should have reflected passion/provocation manslaughter as a possible verdict. However, in light of the applicable plain error standard, we do not find reversible error on this ground. The jury was properly instructed that the elements of murder included a full consideration of, and the State's burden of disproving, passion/provocation manslaughter. The jury is presumed to have understood these instructions. State v. Manley, 54 N.J. 259, 270, 255 A.2d 193 (1969). The jury concluded that the State had proven murder. Under the circumstances of this case, any error in the verdict sheet would not have affected the outcome.

III.
Defendant asserts that the trial court erred by failing to instruct on self-defense both as to the murder charge and the possession charge. According to defendant, Freire's testimony  that defendant told Freire he killed the victim after she attempted to stab defendant  gave rise to the need to instruct on self-defense. Defense counsel, however, failed to request such a charge, and tried the case on the theory that Freire committed the murder.
In a murder case, self-defense exonerates a person who kills but has the reasonable belief that such force was necessary to prevent death or serious injury. Self-defense will apply even if it is found that the belief was mistaken. State v. Kelly, 97 N.J. 178, 198, 478 A.2d 364 (1984). A jury instruction on self-defense is necessary in the following circumstances:
[I]f any evidence raising the issue of self-defense is adduced, either in the State's case or the defendant's case, then the jury must be instructed that the State is required to prove beyond a reasonable doubt that the self-defense claim does not accord with the facts.... [Id. at 200, 478 A.2d 364 (emphasis added).]
See also State v. Abbott, 36 N.J. 63, 72, 174 A.2d 881 (1961); Vigilante, supra, 257 N.J. Super. at 306-07, 608 A.2d 425 (holding that defendant is entitled to have jury consider any legally recognized defense which has even "tenuous" foundation in evidence); *548 Johnston, supra, 257 N.J. Super. at 192, 608 A.2d 364 (holding that court must examine both defense's and prosecution's cases to determine if any evidence supports a claim of self-defense); State v. Burks, 208 N.J. Super. 595, 604, 506 A.2d 779 (App.Div. 1986).
Nonetheless, in State v. Rivers, 252 N.J. Super. 142, 599 A.2d 558 (App.Div. 1991), where defendant appealed his convictions for aggravated assault and unlawful possession of a weapon, we upheld the trial court's refusal to charge the jury on self-defense. Defendant gave alibi testimony that he never used force on the evening when the assaults occurred. Defendant testified he did not have a gun and only heard a shot. Id. at 150, 599 A.2d 558. Based on this alibi testimony, we held that the first prong of N.J.S.A. 2C:3-4(a) was not met. The statute requires that the defendant reasonably believe force is necessary. Under the defendant's version of the facts in Rivers, he was not threatened in any way. Therefore, a charge of self-defense was not necessary. Any other testimony which could have given rise to a need for a self-defense instruction showed defendant the aggressor. Id. at 151, 599 A.2d 558.
Defendant in this case did not request a self-defense charge. R. 1:7-2 provides that, except as otherwise provided by R. 2:10-2, no party can claim error on appeal as to the jury instruction unless it was objected to prior to jury deliberations. R. 2:10-2 provides:
Any error or omission shall be disregarded by the appellate court unless it is of such a nature as to have been clearly capable of producing an unjust result....
However, the court may consider plain error. Ibid.
In State v. Perry, 124 N.J. 128, 590 A.2d 624 (1991), defendant alleged on appeal that the trial court erred by failing to give an instruction on self-defense sua sponte. Defendant testified that he and the victim exchanged some "heated words," and that the victim walked toward him while pointing his finger at defendant. Id. at 161, 590 A.2d 624. However, the defendant never stated that he saw a weapon or that the victim attempted to strike him. Ibid. The only statement in defendant's confession which could have possibly given rise to self-defense was that the victim "came *549 at me as if he had something," and that defendant thought "it was either him or me." Id. at 162, 590 A.2d 624.
The Court held that if the defendant had requested a self-defense charge, this statement may have required the trial court to grant defendant's request.
However, defendant did not request a self-defense charge. Under those circumstances in the face of non-compatible defense strategy, we cannot conclude that the trial court committed plain error in not charging self-defense sua sponte. [Ibid.]
In Perry, defendant was charged with murder, and defense counsel chose to argue that defendant was not present and had not participated in the death of the victim. Id. at 163, 590 A.2d 624. The Court noted a general need to refrain from interfering with defense counsel's strategy.
Trial courts must carefully refrain from preempting defense counsel's strategic and tactical decisions and possibly prejudicing defendant's chance of acquittal. The public interest, while important, may not overwhelm defendant's interest in pursuing a legitimate defense in the complex setting of a criminal trial.... [A]lthough tactical decisions to forego such lesser-included-offense charges do not minimize the public's interest in the appropriate charge, a trial court nonetheless should be sensitive to the potential that such charges might prejudice a defendant's case with respect to a greater crime (as, for example, because additional evidence may then become relevant to the State's case), and make defendant's conviction for the greater crime more likely.
....

Hence, despite the arguable appropriateness of the self-defense charge, such a charge would have been directly contrary to defendant's position at trial, could have prejudiced his chances of being acquitted of knowing murder by emphasizing his presence at the murder scene, and would have forced counsel to have forsaken or altered his chosen strategy. In a close case, forcing counsel to incorporate defenses that presuppose the existence of the very fact his main method of defense contests destroys the credibility and coherence of the defense entirely. [Id. at 162-63, 590 A.2d 624 (emphasis added) (citation omitted).]
Earlier in State v. Grunow, 102 N.J. 133, 148, 506 A.2d 708 (1986), the Supreme Court stated:

Unless a chosen trial strategy dictates against it, and perhaps in some cases even when that is the case, the court ordinarily has a supervening responsibility to charge the jury concerning any version of the offense "clearly indicate[d]" by the evidence to require proper jury consideration. [Ibid. (quoting State v. Choice, 98 N.J. 295, 299, 486 A.2d 833 (1985)) (emphasis added).]
*550 See also Choice, supra, 98 N.J. at 300, 486 A.2d 833 (holding that when a trial court gives a manslaughter charge sua sponte and surprises the prosecution or defense, the unrequested charge may be inappropriate); State v. Ruscingno, 217 N.J. Super. 467, 472-74, 526 A.2d 251 (App.Div.), certif. denied, 108 N.J. 210, 528 A.2d 30 (1987) (holding that defendant's testimony denying involvement in the altercation precluded the trial court from having to give sua sponte a charge on manslaughter).
Although Freire's testimony may have established evidence which would support a theory of self-defense, a charge by the court sua sponte would have prejudiced defense counsel's strategy. Defendant denied playing any part in the victim's murder. His whole theory rested upon the premise that Freire killed the victim.
Any charge on self-defense could have implied that the court believed defendant and the victim engaged in a struggle. Defendant explained any bruises and scratches he had at the time of arrest as attributable to other causes. Defendant stated that although the victim may have cut him on the wrist with a knife, they were only playing.
In addition, the State did not and, for all practical purposes, could not have focused on any struggle which was supposed to have occurred between defendant and the victim. The State was at a loss to question whether defendant believed force was necessary and whether that belief was reasonable. If self-defense had been asserted, the State may have attempted to delve further into the relevant facts.
The trial court's failure to charge self-defense sua sponte did not amount to plain error. Defense counsel chose a strategy which the trial court appropriately decided not to interfere with. Any charge on self-defense would have prejudiced defendant and increased the likelihood of the murder conviction. This analysis applies equally to the possession charge.

*551 IV.
Defendant contends that in addition to a charge on self-defense, the trial court erred by failing to instruct on imperfect self-defense. Such an instruction may have reduced defendant's murder conviction to one for aggravated manslaughter or manslaughter.
In State v. Bowens and the companion case of State v. Rivers, 108 N.J. 622, 532 A.2d 215 (1987), the Court first noted that the Code of Criminal Justice does not contain "an independent category of justification, excuse, or mitigation under the concept of imperfect self-defense." Id. at 626, 532 A.2d 215. Nonetheless, imperfect self-defense may be relevant to the elements of a crime. Ibid. "In some circumstances the evidence may bear upon the question of whether the defendant who committed a homicide in the heat of passion was reasonably provoked." Id. at 641, 532 A.2d 215. The Court recognized that an honest but unreasonable belief in the need for force might affect defendant's culpability. This factor could result in an aggravated manslaughter or manslaughter, as opposed to a murder, conviction. Ibid.
In Coyle, supra, the Court held that the trial court did not err by failing to charge imperfect self-defense. The Court relied on the language of Bowens that the trial court need not supply a separate charge that "imperfect self-defense would serve to reduce murder to an unspecified degree of manslaughter." Coyle, supra, 119 N.J. at 228, 574 A.2d 951 (quoting Bowens, supra, 108 N.J. at 637, 532 A.2d 215). The trial court's instructions on purposeful murder, aggravated manslaughter, reckless manslaughter, and passion/provocation manslaughter properly encompassed all issues. Ibid.
In State v. Pridgen, 245 N.J. Super. 239, 584 A.2d 869 (App. Div.), certif. denied, 126 N.J. 327, 598 A.2d 886 (1991), defendant was indicted for murder but convicted of aggravated manslaughter. Defendant requested jury instructions on self-defense, murder-manslaughter (including imperfect self-defense), reckless manslaughter, aggravated manslaughter, manslaughter, and killing *552 committed in the heat of passion. Id. at 244, 584 A.2d 869. While the judge agreed to charge on murder, aggravated manslaughter, manslaughter, and self-defense, the judge never charged the jury on the theory of imperfect self-defense or passion/provocation manslaughter. Id. at 245, 584 A.2d 869.
We stated that the trial court erred by not explaining the impact of imperfect self-defense on a murder charge. Id. at 246-47, 584 A.2d 869. However, we held that:
[W]hile the jury should have been instructed on the impact of an unreasonable but honest belief in the need to use force in self-defense, to the extent permitted in Bowens with respect to the murder charge, we nevertheless conclude that given defendant's conviction for aggravated manslaughter, an offense requiring only a reckless culpability, defendant suffered no harm or prejudice in this respect. [Id. at 248, 584 A.2d 869.]
One factor which clearly distinguishes Pridgen from this case is that defense counsel made no request for a jury instruction on self-defense or imperfect self-defense. Therefore, the standard governing is whether the failure to charge amounted to plain error. In light of the fact that the trial court instructed the jury on murder, aggravated manslaughter, passion/provocation manslaughter, and reckless manslaughter, no need arose for the judge to charge on imperfect self-defense. Any instruction as to defendant's honest but unreasonable belief that he needed to use force would have placed him at the scene of the murder, thereby prejudicing the strategy chosen by defense counsel. Defendant never claimed that he had to use force. No plain error resulted from the judge's failure to charge imperfect self-defense.

V.
Defendant maintains that the admission of testimony from the victim's sister  that the victim told her she did not want to stay with defendant and wanted to move back home  constituted inadmissible hearsay and violated his rights.
The State argues that it elicited this testimony to refute defendant's assertion that he and the victim were preparing for their upcoming wedding. The State contends that the testimony was *553 pertinent to the victim's state of mind, an exception to the hearsay rule.
Evid.R. 63(12) provides in pertinent part:
A statement is admissible if it was made in good faith and it (a) described the declarant's then existing state of mind, emotion or physical sensation, including statements of intent, plan, motive, design, mental feeling, pain and bodily health, but not including memory or belief, to prove the fact remembered or believed, when such a mental or physical condition is in issue or is relevant to prove or explain acts or conduct of the declarant. .. . [Emphasis added.]
In State v. Machado, 111 N.J. 480, 545 A.2d 174 (1988), the trial judge admitted testimony of the victim's statements to several people indicating that defendant beat her and that she was afraid of defendant. On appeal, the Court dismissed the State's argument that it introduced the hearsay testimony to rebut the defendant's claim that the victim and defendant had a good relationship.
As to the facts, the State argues that the victim's state of mind was relevant because the defendant placed his relationship with the victim in issue by claiming that the relationship was a good one. The challenged statements, however, were offered by the State and admitted into evidence through various witnesses on the State's direct case. Of necessity, this occurred before the defendant offered any evidence about his relationship with the victim. Hence, the State is simply wrong in trying to justify the admission of the hearsay statements for the asserted reason that the defendant placed that relationship in issue. [Id. at 487, 545 A.2d 174 (emphasis added).]
The Court held that declarations of the victim's state of mind should not be admitted to prove defendant's motive, but stated:
Finally, we do not foreclose the possibility that some of the victim's statements may be admissible as background to establish the nature of the relationship between the victim and the defendant. Thus, the statements are indirectly relevant as part of the "mosaic" of the event. State v. Baldwin, supra, 47 N.J. at 394 [221 A.2d 199]. To this limited extent, the victim's state of mind reflects her perception of and is relevant to their relationship. [Id. at 489, 545 A.2d 174.]
Machado is distinguishable in that the State did not produce the testimony of the victim's sister until after the defendant called Edward Norton as a witness. Norton testified that within thirty-six hours of the victim's death, defendant and the victim were at his residence looking at wedding invitations. Defendant himself testified that the couple planned to be married on April 2, 1988. Defendant put his relationship with the victim at issue. The State *554 called the victim's sister as a rebuttal witness. The hearsay statements were not offered to show that the victim was afraid of defendant, but rather to show her state of mind regarding her relationship with defendant. Cf. State v. Dreher, 251 N.J. Super. 300, 318, 598 A.2d 216 (App.Div. 1991), certif. denied, 127 N.J. 564, 606 A.2d 374 (1992) (the court separated hearsay statements into two distinct categories. Those describing "the foundering state of the marriage" were admissible as background establishing the nature of the relationship and to refute any attempt by defendant showing that defendant and his wife had a good relationship. However, hearsay statements that victim planned to leave defendant and obtain a divorce were inadmissible to demonstrate defendant's motive for killing his wife.); State v. Downey, 206 N.J. Super. 382, 502 A.2d 1171 (App.Div. 1986).
In State v. Baldwin, 47 N.J. 379, 221 A.2d 199, cert. denied, 385 U.S. 980, 87 S.Ct. 527, 17 L.Ed.2d 442 (1966), the State attempted to prove that defendant killed the victim because the victim planned to testify against defendant. "[D]efendant sought to negate such a motive by showing their relationship was cordial." Id. at 392, 221 A.2d 199. Defendant attempted to introduce testimony about statements the victim made prior to his death.
The Court held:
Declarations by the victim of the crime, or by the accused prior to the criminal event, are admitted notwithstanding their "hearsay" character. Generally the basis for accepting such testimony is that the behavior of both the victim and the defendant are part of the mosaic of the criminal event, and hence, insofar as their declarations bear upon either the quality of their acts or a relevant state of mind, they must be accepted as part and parcel of the critical scene. [Id. at 394, 221 A.2d 199.]
In State v. Benedetto, 120 N.J. 250, 576 A.2d 828 (1990), the Court reviewed earlier case law and expounded on the state of mind exception to the hearsay rule. The trial court had allowed certain hearsay statements of the victim "recounting threats he had perceived" into evidence. Id. at 252, 576 A.2d 828. The testimony in dispute in Benedetto came from the victim's girlfriend. On the night the victim was murdered, the victim conversed with his girlfriend and told her he was meeting defendant *555 later that night. He explained that he owed defendant's father a large debt, had been receiving threatening calls, and had been followed. He never implied that defendant was making the threats. Id. at 253-54, 576 A.2d 828. During summation, the prosecutor used this testimony to state: "You know that he [the victim] was fearful because he had been threatened regarding that money." Id. at 260, 576 A.2d 828.
The Court held that a victim's hearsay statements of fear which reflect on the defendant's state of mind are not admissible as a state of mind exception. Id. at 257, 576 A.2d 828. The Court noted that Baldwin, supra, permitted the admission of such statements. However, the admission of the statements in Baldwin was appropriate because the declarant's state of mind was an issue. Id. at 258, 576 A.2d 828. Because the testimony in Benedetto reflected a general expression of the victim's fear and the victim's state of mind was not an issue, the Court held that the trial court erred by admitting the testimony. Id. at 261, 576 A.2d 828. The testimony had minimal probative value which was "clearly outweighed by the potential prejudice associated with jury misuse of the evidence." Ibid.
However, this did not determine the issue. No objection was made to the admission of the testimony, and the Court had to decide whether the error constituted harmless error. "`[T]he question whether an error is reason for reversal depends finally upon some degree of possibility that it led to an unjust verdict.'" Ibid. (quoting State v. Macon, 57 N.J. 325, 335, 273 A.2d 1 (1971)). In Benedetto, other evidence of defendant's guilt was overwhelming. Id. at 261-62, 576 A.2d 828. The Court concluded that the error was harmless. Id. at 262, 576 A.2d 828.
In this case, the victim's sister testified that:
Q I want to draw your attention to Sunday, February 28th, 1988, and Monday evening, February 29th, 1988. Did your sister mention anything to you about wanting to leave Pedro Vasquez?
A Yes.
Q What did she tell you?

*556 A She told me that she didn't want to stay with him any more, she wanted to get her clothes out of his house, she wanted to come back home.
At no time did the sister testify that the victim was afraid of defendant. This was not the purpose of the rebuttal testimony offered by the State. During summation, the prosecutor stated: "[s]he was going to get her stuff and come home.... He murdered her and he murdered her because she was leaving." Thus, the prosecutor, without objection, used the hearsay statements to provide a motive for the killing.
This case differs from those cases in which the hearsay statements of the victim express a fear of defendant. The State based its case on the theory that defendant killed the victim because she was leaving him. Further, defendant put his relationship with the victim in issue. The State did not attempt to elicit this hearsay testimony until Norton testified. The hearsay statements were relevant to the background of the defendant's relationship with the victim.
Because defense counsel failed to object to the statements, the plain error rule applies. It must be asked whether admission of the statements, even if error, led to an unjust verdict. Freire testified that defendant told him that the victim wanted to leave defendant. Defendant told another witness, "I lose one, I don't want to lose another one," implying that defendant did not want to lose his girlfriend. This testimony was admissible as the statements came from defendant. The fact that the victim contemplated leaving defendant was already presented to the jury. Therefore, any prejudice resulting from the admission of the hearsay testimony did not reach the level of plain error.

VI.
Defendant relies on Evid.R. 20 for the proposition that the trial court erred by admitting Freire's entire statement into evidence. He now asserts that the statement was admissible only to show that the testimony was a recent fabrication. "[I]ntroduction of the entire six page statement was not necessary to address *557 the limited inconsistencies pointed out by defense counsel in his cross-examination."
During trial, defense counsel attempted to elicit several inconsistencies between Freire's prior statement and his trial testimony. At one point defense counsel asked Freire whether he had "lied earlier," referring to his statement. During his closing, defense counsel pointed out the inconsistencies and emphasized that Freire's recount of the events was incredible.
Assuming the court should have limited admission of the statement to those portions which were contested, it is unlikely that the jury would have reached a different verdict but for the admission of the statement. Further, not only did trial counsel fail to object to the admission of the entire statement, it appears that counsel may have felt it advantageous to his case for the jury to view the entire statement.
Defense counsel also failed to request a limiting instruction and did not object at the close of the trial court's charge. See State v. Sullivan, 24 N.J. 18, 39, 130 A.2d 610, cert. denied, 355 U.S. 840, 78 S.Ct. 52, 2 L.Ed.2d 51 (1957). Defense counsel questioned Freire extensively about several inconsistencies between his trial testimony and his prior statement. Further, defendant's whole theory of the case was that Freire lied from the outset to implicate defendant when Freire himself murdered the victim. The substance of Freire's statement was thoroughly elicited both on direct and cross-examination. "Plain error is reversible if it is `clearly capable of producing an unjust result.'" State v. Cofield, 127 N.J. 328, 341, 605 A.2d 230 (1992) (quoting State v. Hunt, 115 N.J. 330, 363, 558 A.2d 1259 (1989)) (citation omitted).
We find defendant's assertion of plain error to be clearly without merit. R. 2:11-3(e)(2).

VII.
Defendant contends that the trial court erred by not instructing that defendant's pre-arrest silence was only relevant as to his *558 credibility. The State contends any error did not constitute plain error as defense counsel did not request such a charge.
In State v. Merola, 214 N.J. Super. 108, 518 A.2d 518 (App.Div. 1986), certif. denied, 107 N.J. 91, 526 A.2d 168 (1987), the State claimed that defendant shot two people during a drug deal. Defendant stated that the two victims shot each other. Id. at 112-13, 518 A.2d 518. Defendant only came forward, however, after he read about the incident in a local newspaper. Id. at 114, 518 A.2d 518.
At trial, the prosecutor questioned defendant about why he did not contact the police immediately. The trial court informed the jury that it could consider defendant's silence prior to the time "he became a subject of [a] criminal investigation." Ibid. Defense counsel did not object to the charge. Ibid. On appeal, defendant argued that this violated his right against self-incrimination.
We noted the general disagreement among the states as to whether pre-arrest silence can be used to undermine a defendant's credibility. Id. at 117-18, 518 A.2d 518. For purposes of the decision, we "[a]ssum[ed], without deciding, that a defendant's failure to volunteer exculpatory information to the authorities prior to his arrest may generally be used to attack his credibility...." Id. at 118, 518 A.2d 518. We then set forth a two-part test for determining whether pre-arrest silence is probative. Ibid. First, whether the failure to speak was unnatural, and second, whether an ordinary person would have come forward with the exculpatory information under the circumstances. Ibid.
We held that defendant's pre-arrest silence was not probative. At trial, defendant freely admitted that he had been involved with the drug deal. Thus, it would not have been natural for him to come forward with incriminating evidence against himself. Further, defendant testified that he did not know anyone was shot. Defendant's choice not to come forward reflected "defendant's conscious reliance upon his right to remain silent." Ibid. However, we held that the prosecutor's questioning had no prejudicial impact as defendant thoroughly testified on direct and cross-examination *559 as to his reasons for not coming forward. Id. at 121, 518 A.2d 518.
In State v. Brown, 118 N.J. 595, 573 A.2d 886 (1990), defendant was indicted for murder by auto. Defendant waited two days to report his involvement in the accident to the police. Id. at 609, 573 A.2d 886. The trial court allowed the prosecutor and a co-defendant to question defendant as to his pre-arrest silence. However, they were not allowed to comment on this before the jury. Id. at 610, 573 A.2d 886. At a post-trial hearing, new and separate trials were ordered for the co-defendants, due in part to the trial court's earlier decision allowing questions regarding defendant's pre-arrest silence. Ibid.
The Court in Brown closely analyzed Merola and concluded that evidence of pre-arrest silence, "particularly in the absence of official interrogation," does not violate a defendant's right against self-incrimination. Id. at 613, 573 A.2d 886; accord Jenkins v. Anderson, 447 U.S. 231, 238, 100 S.Ct. 2124, 2129, 65 L.Ed.2d 86, 95 (1980). In Brown, the Court distinguished the facts of Merola. The defendant's pre-arrest silence in Brown was unnatural.
[I]t would have been "natural" for [defendant] to have spoken to the police about his involvement sooner than he did had his testimonial version of the episode been true, and he believed that it exonerated him. Moreover, according to his own version, [defendant] possessed important, perhaps unique, information relating to the accident. It would appear natural for a reasonable person in [defendant's] place to have related to the police  who were then investigating the accident and obviously seeking to learn how the accident occurred  that he was an eyewitness.
....

We conclude, therefore, that evidence regarding pre-arrest silence is admissible if, when viewed objectively and neutrally in light of all circumstances, it generates an inference of consciousness of guilt that bears on the credibility of the defendant when measured against the defendant's apparent exculpatory testimony. [Brown, supra, 118 N.J. at 614-15, 573 A.2d 886 (emphasis added).]
In this case, defendant claimed that he did not contact the police because he was afraid he would be convicted of the crime. He further indicated that he was afraid of Freire. Defendant's testimony at trial, though, made clear that at one point defendant *560 had sole possession of the knife. Further, while he and Freire were disposing of the body, they were stopped by police. Instead of telling the police about the events, defendant merely asked for directions. Defendant's testimony at the trial was that he had nothing to do with the victim's murder except that Freire had him help dispose of her body. If defendant's version of the facts were true, in light of the circumstances surrounding his relationship with the victim, it would be "natural" for him to have come forward. The prosecutor appropriately brought this out on cross-examination as to defendant's credibility.
Again, it could be argued that the trial court should have given a specific limiting instruction so that the jury would only consider this testimony as to defendant's credibility. However, the whole case revolved around credibility. The jury was advised that they should consider the demeanor, manner of testifying, the interest in the outcome, and the believability and logic of the testimony. The judge's failure to give a limiting instruction does not amount to plain error under these circumstances.

VIII.
Defendant alleges six instances of prosecutorial misconduct, only one of which was objected to at trial. We find each of defendant's contentions of reversible error to be clearly without merit. R. 2:11-3(e)(2). When counsel fails to object at trial, the reviewing court may infer that counsel did not consider the remarks to be inappropriate. State v. Johnson, 31 N.J. 489, 511, 158 A.2d 11 (1960). Further, a conviction should not be reversed for prosecutorial misconduct "unless the conduct was so egregious that it deprived defendant of a fair trial." State v. Ramseur, 106 N.J. 123, 322, 524 A.2d 188 (1987). None of the instances cited by defendant, either separately or cumulatively, denied defendant a fair trial.

IX.
Defendant argues that we cannot conduct a "meaningful" review of his sentence because of the lack of a sentencing transcript. *561 He urges that we remand for a reconstruction of the sentencing hearing. We previously denied this request when it was made by motion during the pendency of this appeal.
The Court in State v. Jarbath, 114 N.J. 394, 410-11, 555 A.2d 559 (1989), stated:
Pursuant to [State v.] Roth [95 N.J. 334, 471 A.2d 370 (1984)], an appellate court could, under the Code, use its original jurisdiction in conjunction with its review jurisdiction over sentences to examine whether the aggravating and mitigating factors are based on sufficient evidence. Further, even if the sentence was within the established guidelines and based on sufficient evidence, it could invoke such jurisdiction to decide whether a sentence "shocked the judicial conscience."
The Jarbath Court further stated in a footnote that:
Sentencing procedures rely largely on a "paper record" (Sentencing Manual for Judges, p. 69 (September 1988); see N.J.S.A. 2C:44-6b), which the appellate courts are as equipped to evaluate as the sentencing court. [Id. at 412 n. 4, 555 A.2d 559.]
Defendant claims that he especially needs a reconstruction of the record because defense counsel has changed. In State v. Gaines, 147 N.J. Super. 84, 370 A.2d 856 (App.Div. 1975), aff'd sub.nom. State v. Powers, 72 N.J. 346, 370 A.2d 854 (1977), counsel asserted the same argument. The court held, "It is not meaningful ... for designated defense counsel on appeal to state that he cannot effectively discharge his duty without saying in what way the absence of a transcript has hampered his performance." Id. at 93, 370 A.2d 856.
Defense counsel does not indicate how a verbatim transcript would enable him to better represent defendant. Further, the sentencing judge has retired, and any other judge at the trial court level would be in no better position than this court to determine the circumstances surrounding the imposition of sentence. Accordingly, a reconstruction of the sentencing hearing is inappropriate.

X.
We, therefore, proceed to defendant's contention that he should not have received a life sentence as he had no prior *562 criminal activity. In support of the life sentence, the trial court gave the following findings:
After the murder, the defendant dismembered the corpse and disposed parts of it in various locations in the area.
Thus the Court found the following Aggravating Circumstances.
1. The nature and circumstances of the offense, and the role of the actor therein, including whether or not it was committed in an especially heinous, cruel, or depraved manner;
9. The need for deterring the defendant and others from violating the law.
The Court found the following Mitigating Circumstance:
7. The defendant has no history of prior delinquency or criminal activity or has led a law-abiding life for a substantial period of time before the commission of the present offense;
The sentence intended to be punitive.
N.J.S.A. 2C:11-3b governs sentences imposed for murder convictions.
b. Murder is a crime of the first degree but a person convicted of murder shall be sentenced, except as provided in subsection c. of this section, by the court to a term of 30 years, during which the person shall not be eligible for parole or to a specific term of years which shall be between 30 years and life imprisonment of which the person shall serve 30 years before being eligible for parole.
The minimum sentence the trial court could have imposed was a thirty-year sentence during which defendant would not be eligible for parole. However, defendant asserts that "[m]ore stringent sentences should be imposed on repetitive murderers or those who have committed numerous other crimes...." Defendant attempts to convince this court that other mitigating factors existed, such as the fact that defendant acted under strong provocation. Further, the dismemberment should not be an aggravating factor as "it was not done to inflict pain and suffering on the victim."
The court in State v. Scales, 231 N.J. Super. 336, 555 A.2d 707 (App.Div.), certif. denied, 117 N.J. 123, 564 A.2d 851 (1989), considered whether the trial court erred by imposing a life sentence with a thirty-year period of parole ineligibility. In Scales, the defendant strangled the victim and then stole his car. Id. at 337, 555 A.2d 707. Defendant qualified as a persistent offender. Id. at 340, 555 A.2d 707.
*563 The court held that the sentence was "neither manifestly excessive nor unduly punitive." Id. at 340, 555 A.2d 707. The standard on appeal is whether the sentence constituted a miscarriage of justice or shocked the judicial conscience. Ibid.; see also State v. Roth, 95 N.J. 334, 362-66, 471 A.2d 370 (1984). The court did not reverse.
In this case defendant strangled the victim and stabbed her, apparently because she was leaving him. He then dismembered the victim's body and disposed of it in various locations around Newark. The life sentence and thirty-year parole ineligibility term does not shock the judicial conscience. See State v. Serrone, 95 N.J. 23, 25, 468 A.2d 1050 (1983) (holding that life sentence for murder is really ordinary sentence).
Finally, defendant maintains that the trial court abused its discretion by failing to merge the conviction for possession of a weapon for an unlawful purpose into the murder conviction. Defendant's assertion is correct.
In State v. Nutter, 258 N.J. Super. 41, 609 A.2d 65 (App.Div. 1992), we held that the defendant's conviction for possession of a knife for an unlawful purpose should have been merged with defendant's murder conviction. Id. at 59, 609 A.2d 65. The evidence did not show that defendant had the knife for any purpose other than to stab the victim, or that the purpose for having the knife extended beyond the murder. Ibid.; see also State v. Best, 70 N.J. 56, 67, 356 A.2d 385 (1976) (holding that conviction of knife for unlawful purpose merged with armed robbery conviction as State presented no evidence that defendant carried knife at any time other than for robbery or had knife for any other purpose); cf. State v. Johnson, 203 N.J. Super. 127, 136, 495 A.2d 1367 (App.Div.) (evidence that defendant had a gun to be used to threaten a third person prior to shooting the victim precluded merger), certif. denied, 102 N.J. 312, 508 A.2d 195 (1985). Defendant's conviction for possession of a weapon for an unlawful purpose merged with the murder conviction as the State *564 presented no evidence showing that defendant had the knife for any other purpose but to facilitate the murder.
We affirm defendant's murder conviction and the sentence imposed. We vacate his conviction for possession of a weapon for an unlawful purpose as it merged into the murder conviction.