SYLLABUS

This syllabus is not part of the Court's opinion. It has been prepared by the Office of the Clerk for the convenience of the reader. It has been neither reviewed nor approved by the Court and may not summarize all portions of the opinion.

**State v. Quinnizel J. Clark** (A-67-20/A-37-21) (085271)

**Argued January 18, 2022 and March 28, 2022 -- Decided June 29, 2022**

**PIERRE-LOUIS, J., writing for a unanimous Court.**

In this appeal, the Court considers whether it was harmful error to allow the jury to hear the portion of defendant Quinnizel J. Clark's statement to police after he invoked his right to counsel but the interrogation continued. The Court also considers certain remarks in the prosecutor's summation -- including that the invocation was a sign of guilt -- as well as the admissibility of witness testimony.

On January 3, 2016, police found James Dewyer without a pulse in his silver Dodge on the side of Kinkora Road in Mansfield. That morning, Dewyer had picked up defendant at a motel in Mansfield, and the men drove to a casino. Cameras in front of the motel showed defendant and Dewyer return to the motel and then depart in Dewyer's car in the afternoon. Surveillance video showed defendant later return to the motel alone and then leave in different clothes.

On January 13, 2016, Detective Wayne Raynor and another officer interviewed defendant about Dewyer's death. Defendant was read his Miranda rights and waived those rights. After approximately 40 minutes, Detective Raynor began to confront defendant with his belief that defendant murdered Dewyer and pressed defendant about his alibi. Defendant responded, "charge me, call my attorney Mr. Keisler over here, charge me and let's go." The interrogation continued and Detective Raynor expressed that if he were in defendant's shoes, he would tell the officers who he was with so that he is "not on the hook for [the murder]." Detective Raynor suggested that defendant did not want to tell them who he had been with during the time of the murder because he was lying. Defendant said, "[i]f it's game over, charge me, go get my attorney, charge me, and let's go to court." The interrogation ended when defendant requested his attorney a third time.

Defendant was charged with first-degree murder and weapons offenses. The trial court denied defendant's motion to suppress his statement. When the statement was played at trial, the jury heard defendant's invocation of his right to counsel as well as the officers' continued questioning and their insinuations of his guilt. The State also offered into evidence surveillance footage from the motel and casino, and

1

called Jeffrey and Sandra Carver to testify. The Carvers testified that on January 3, 2016, they saw a silver car parked on the side of Kinkora Road. The Carvers described a man they saw walking away from the car, who appeared to fit defendant's description. They were never asked to identify defendant in a photographic or in-person lineup or even while in court during the trial.

During summation, the prosecutor commented on defendant's not being Dewyer's friend because he did not help him into the casino; his changing clothes on the afternoon of the murder to avoid being identified; and the man the Carvers saw being defendant. The prosecutor also argued that Detective Raynor "practically begged" defendant to provide information regarding his alibi, but defendant refused, which suggested his guilt. The jury found defendant guilty on all counts.

In a split decision, the Appellate Division vacated defendant's conviction and remanded the matter for a new trial based on cumulative error. The majority ordered the trial court to conduct an N.J.R.E. Rule 104(a) hearing as to the admissibility of the Carvers' testimony and appeared to take issue with several comments made by the prosecutor during summation. The majority noted, but took no issue with, the fact that the jury heard defendant's invocation of his right to counsel. The dissent found no reversible error.

The State appealed as of right, and the Court granted certification on whether defendant's Fifth Amendment rights were violated. 249 N.J. 559 (2022).

**HELD:** Once defendant invoked his right to counsel, the interrogation should have stopped. Not only did the interrogation continue, but during the questioning, the detective strongly suggested that defendant would give them the information they sought if he were truly innocent. Allowing that entire exchange to be played for the jury was harmful error. In addition, the error was compounded when the prosecutor commented on that portion of the statement that should have never been before the jury in the first place. The Court discerns no error regarding the witness testimony or any of the prosecutor's other comments during summation.

1. There was never an identification in this case, so there was no need for a Rule 104 hearing. The Carvers' testimony is relevant and presumed admissible because it tends to prove that defendant was near the scene of the crime around the time of the crime, contrary to his alibi. Nothing in the record suggests that the probative value of their testimony is substantially outweighed by the risk of undue prejudice, confusion of issues, or misleading the jury. The trial court thoroughly instructed the jury as to the State's burden and how to evaluate the credibility of witness testimony, so its failure to give a lack of identification charge did not possess a clear capacity to bring about an unjust result. The charge should be given on remand, however, because there was no identification by any witnesses. (pp. 23-25)

2

2.  Prosecutors are afforded considerable leeway in closing arguments.  As long as the prosecutor stays within the evidence and the legitimate inferences therefrom, there is no error.  Here, the prosecutor's comments in summation that defendant did not assist Dewyer in walking into the casino, regarding defendant changing his clothes when he returned to the motel without Dewyer, and that the person the Carvers saw the day of the murder was defendant were proper commentary on the evidence before the jury and not so egregious as to have deprived defendant of a fair trial.  Those statements by the prosecutor were confined to the evidence revealed during the trial and inferences the prosecutor was allowed to draw from that evidence.  Nothing in those comments amounted to reversible error.  (pp. 25-28)

3.  Pursuant to <u>Miranda v. Arizona</u>, if an individual subjected to police interrogation while in custody "states that he wants an attorney, the interrogation must cease until an attorney is present."  384 U.S. 436, 474 (1966).  Under the state privilege against self-incrimination, any indication of a desire for counsel, however ambiguous, will trigger the entitlement to counsel.  In situations in which a suspect has waived his or her <u>Miranda</u> rights and agreed to speak to law enforcement, but later invoked the right to counsel during the interrogation, trial courts should endeavor to excise any reference to a criminal defendant's invocation of his right to counsel from the statement that the jury hears.  When testimony explaining why an interview or interrogation was terminated is necessary, instruction should be provided that explains to the jury that people decline to speak with police for many reasons, emphasizing that a defendant's invocation of his right to counsel or right to remain silent may not in any way be used to infer guilt.  (pp. 28-32)

4.  When defendant invoked his right to counsel by stating, "call my attorney Mr. Keisler over here," all questioning should have ceased and that portion of the recording should have been excised from the statement played for the jury.  The jury not only heard the invocation and the detective's comments thereafter, but also heard the prosecutor in summation note that Detective Raynor "practically begged" defendant for information on his alibi.  Although the portion of the statement prior to invocation of the right to counsel is admissible and open for fair comment, nothing in that exchange can be characterized as the detective "begging" for more information.  It was the post-invocation exchange to which the prosecutor's comments referred.  Given the State's circumstantial case, it was harmful error for the jury to have heard defendant invoke his right to counsel and then hear the prosecutor insinuate defendant's guilt based on his refusal to answer.  (pp. 32-41)

**AFFIRMED AS MODIFIED and REMANDED for a new trial.**

**CHIEF JUSTICE RABNER and JUSTICES ALBIN, PATTERSON, and SOLOMON join in JUSTICE PIERRE-LOUIS's opinion.  JUDGE FUENTES (temporarily assigned) did not participate.**

SUPREME COURT OF NEW JERSEY
A-67 September Term 2020
A-37 September Term 2021
085271

State of New Jersey,

Plaintiff-Appellant/Cross-Respondent,

v.

Quinnizel J. Clark,

Defendant-Respondent/Cross-Appellant.

On appeal from and certification to the Superior
Court, Appellate Division.

| Argued | Decided |
|---|---|
| January 18, 2022 (A-67-20) | June 29, 2022 |
| March 28, 2022 (A-37-21) | |

Valeria Dominguez, Deputy Attorney General, argued the
cause for appellant/cross-respondent (Matthew J. Platkin,
Acting Attorney General, attorney; Valeria Dominguez,
of counsel and on the briefs).

Daniel S. Rockoff, Assistant Deputy Public Defender,
argued the cause for respondent/cross-appellant (Joseph
E. Krakora, Public Defender, attorney; Daniel S.
Rockoff, of counsel and on the briefs).

JUSTICE PIERRE-LOUIS delivered the opinion of the Court.

1

Fifty-six years ago, the United States Supreme Court held that individuals subject to police interrogation must be advised of certain rights, including the right to remain silent and the right to have an attorney present, to safeguard the right against self-incrimination. Miranda v. Arizona, 384 U.S. 436, 477-79 (1966). Accordingly, it is well-established in federal and state jurisprudence that when a suspect invokes the right to counsel, law enforcement must cease the interrogation. Id. at 473-74; State v. Chew, 150 N.J. 30, 63 (1997). This appeal presents a case in which law enforcement officers failed to uphold that basic principle by not scrupulously honoring invocations of the right to counsel.

Defendant Quinnizel Clark was convicted of murder and sentenced to life imprisonment. At trial, the State played for the jury Clark's videotaped statement to police prior to his arrest. At one point during the statement, police pressed defendant about his alibi and confronted him with their theory that defendant killed James Dewyer. In response, defendant told officers, "charge me, call my attorney Mr. Keisler over here, charge me and let's go." Even though defendant twice advised officers to call his attorney, the interrogation continued. The officers continued to urge defendant to tell them who he had been with during the time of the murder and to suggest that he did not want to tell them because he was lying, and therefore guilty. Defendant

2

asked officers to call his attorney a third time, and the interrogation ended. When the statement was played for the jury at trial, the jury heard defendant's invocation of his right to counsel as well as the officer's continued questioning and their insinuations of his guilt. During summation, the State argued that the detective "practically begged" defendant to provide information regarding his alibi, but defendant refused, which again suggested his guilt.

On appeal, in a split decision, the Appellate Division vacated defendant's conviction and remanded the matter for further proceedings based on cumulative error. The court held that certain witness testimony was impermissibly suggestive of identification and prejudicial to defendant. The Appellate Division therefore ordered the trial court to conduct an N.J.R.E. 104(a) hearing as to the admissibility of that testimony. The majority also appeared to take issue with several comments made by the prosecutor during summation. The court concluded that the cumulative effect of the errors rendered the trial unfair. The majority noted, but took no issue with, the fact that the jury heard defendant's invocation of his right to counsel during the statement he gave to the police.

The dissenting judge found no reversible error regarding the witness testimony or any of the prosecutor's comments.

3

For the reasons stated below, we affirm as modified the Appellate Division's decision vacating defendant's conviction and remand for a new trial based on a violation of defendant's Fifth Amendment rights. Once defendant invoked his right to counsel, the interrogation should have stopped. Not only did the interrogation continue, but during the questioning, the detective strongly suggested that defendant would give them the information they sought if he were truly innocent. Allowing that entire exchange to be played for the jury was harmful error. In addition, the error was compounded when the prosecutor commented on that portion of the statement that should have never been before the jury in the first place. Unlike the Appellate Division majority, we discern no error regarding the witness testimony or any of the prosecutor's other comments during summation.

I.

A.

We rely on the testimony at trial for the following factual summary. On January 3, 2016, at 4:17 p.m., Sergeant Daniel Pachuta responded to a report about an unresponsive man in a car on the side of Kinkora Road in Mansfield. At the scene, Sergeant Pachuta found James Dewyer without a pulse in the passenger's seat of his silver Dodge Avenger. Dewyer was still warm to the touch at the time. Paramedics arrived shortly thereafter and, in attempting to

4

remove him from the car, observed that Dewyer had entry wounds from five close-range gunshots in his left abdomen. Dewyer was later pronounced dead at a local hospital.

In searching Dewyer's vehicle, officers found in the glove compartment a receipt that showed Dewyer paid $1,050 in October 2015 to bail defendant out of jail. In Dewyer's wallet, law enforcement found, among other things, a receipt timestamped 9:52 a.m. on the morning of his death from Delaware Park Casino. The investigation revealed that at 7:00 a.m. on January 3, 2016, Dewyer picked up defendant at the Riverfront Motel on Route 130 in Mansfield and the men drove to the Delaware Park Casino in Wilmington, Delaware. Dewyer met defendant at the motel. Defendant stayed there at times and Dewyer frequented the motel, giving many of the residents there rides.

Surveillance cameras at the Delaware Park Casino showed defendant and Dewyer arrive at the casino at approximately 8:34 a.m. and depart at approximately 11:00 a.m. Cameras in front of the Riverfront Motel showed defendant and Dewyer return to the motel at approximately 12:21 p.m. Defendant went inside the motel and exited sometime later with a red and black backpack. When defendant and Dewyer reentered the car, defendant was driving and Dewyer was in the passenger seat. The men departed the motel at

5

approximately 1:34 p.m. At 3:28 p.m., surveillance video showed defendant return to the motel with his backpack on his back, alone and on foot.

On January 13, 2016, Detective Wayne Raynor of the Burlington County Prosecutor's Office and another officer interviewed defendant about Dewyer's death.[1] Detective Raynor told defendant that he was not under arrest but read defendant his Miranda rights. Defendant waived his rights and agreed to provide a recorded statement.

After obtaining background information on defendant, officers asked defendant what he knew about Dewyer. Defendant told officers that he called Dewyer "Jimmy Dean" and explained his friendship with Dewyer, referring to Dewyer as his "gambling buddy." Defendant stated that he and Dewyer were close because they both enjoyed horse racing. Defendant stated that he and Dewyer went to a casino in Delaware every Sunday morning, including the day Dewyer was killed.

Defendant stated that after he and Dewyer returned from the casino that morning, defendant went into the motel and then left with Dewyer about an hour later. According to defendant, Dewyer dropped him off in Roebling and

---

[1] Although there were two officers in the room, Detective Raynor is the only one who spoke.

defendant believed Dewyer then proceeded to pick up a friend's daughter. Defendant claimed that was the last time he saw Dewyer.

When the officers asked defendant what he was doing in Roebling, defendant hesitated. After some initial back and forth about defendant not wanting to talk about why he was in Roebling, defendant asked the officers whether he could get in trouble for stating what he was doing there. Ultimately, defendant told police that he went to Roebling, met up with someone, and "traded something for something." That entire conversation, wherein defendant insinuated he was in Roebling doing something illegal, was redacted from the videotaped statement played for the jury.[2]

After approximately 40 minutes of an arguably congenial interview with defendant, Detective Raynor began to confront defendant with his belief that defendant was involved in Dewyer's murder. Raynor accused defendant of knowing more about Dewyer's pension money than he had revealed. Detective Raynor also told defendant that it was obvious from their investigation that

---

[2] Although the conversation was deleted from the video, the copies of the transcript the jurors received at trial to assist them in following along with the video inadvertently included five lines of the redacted video, including defendant's statement that he "traded something for something." Additionally, possibly because of the five lines inadvertently left in the transcript, during summation the prosecutor noted three times that defendant claimed he was in Roebling and "trade[d] something for something."

defendant and Dewyer were together all day and that defendant walked back to the motel from the area where Dewyer's body was found. Raynor told defendant "it's game over." Defendant responded, "[c]harge me and let's go to court then. If it's game over, charge me and let's go to court." Detective Raynor then pressed defendant for information on his alibi and the following exchange occurred, which we reproduce at length for context:[3]

> DETECTIVE: Tell us exactly where you were and I'll, I'll get you to shoot up and we'll get you off --
>
> DEFENDANT: Listen.
>
> DETECTIVE: ****.
>
> DEFENDANT: I, I already told you where I was.
>
> DETECTIVE: But if you exonerate yourself. Who ****.
>
> DEFENDANT: ****
>
> DETECTIVE: We'll go talk to them in an hour and say it was [Q] ****. I don't care what you were doing with him, the answer is gonna be no [Q]. Because this is a game you can smile.
>
> DEFENDANT: **** because it wasn't true.

---

[3] As noted, the jury was provided a transcript of defendant's videotaped statement to follow along with while watching the tape. The trial judge advised the jury that if they hear "something that is different than what is written in the transcript, [they were] to follow what [they] hear[d]." There are portions of the transcript that include a series of four asterisks. Those asterisks appear to denote undecipherable speech.

8

DETECTIVE:  Because you weren't **** that's gonna say, oh yeah, [Q] was with me on Sunday.  I'm not gonna ask you what you were doing.  You have an out here.  I'll have it run down in an hour.  We've got 50 guys out there.

DEFENDANT:  Listen, listen.

DETECTIVE:  All right.

DEFENDANT:  <u>You say it's game over, charge me, call my attorney Mr. Keisler over here, charge me and let's go. Plain and simple.  Plain and simple.  Plain and simple.</u>

DETECTIVE:  So you, so you want us to write that down?

DEFENDANT:  Plain and simple.  Plain and simple.

DETECTIVE:  Do you want us to run that down[?]

DEFENDANT:  **** down.

DETECTIVE:  Who you were with so that we can move aside and say that he wasn't, he was with who he said he was with.

DEFENDANT:   Listen, listen.

DETECTIVE:  But I know ****.

DEFENDANT:  ****.

DETECTIVE:  Why would you believe, if I were sitting in your seat and somebody was telling me that --

DEFENDANT:  **** believe --

DETECTIVE:  -- I'm good for murdering the guy, I would say, you know what, I was with this person.  You can go checking 'cause I'm not on the hook for that.

9

DEFENDANT:  Listen.

. . . .

DETECTIVE:  You have absolutely no desire to tell us who you were with in Florence because it's bullsh*t.

DEFENDANT:  I wasn't in Florence.

DETECTIVE:  ****.  Excuse me, excuse me, **** if I was on the hook for something like this, I would probably say --

DEFENDANT:  Officer.

DETECTIVE:  -- [W]ho I was with **** and let us run it down.

DEFENDANT:  <u>Listen, listen.  If it's game over, charge me, go get my attorney, charge me, and let's go to court.</u>

DETECTIVE:  ****

DEFENDANT:  Plain and simple.  You're sure.

DETECTIVE:  I'm sure.

DEFENDANT:  ****

DETECTIVE:  I'm asking you ****.

DEFENDANT:  <u>No, no.  I just told you what's gonna transpire.  Go get my attorney.</u>

DETECTIVE:  Okay.

DEFENDANT:  Charge me.  And that's it.

[(emphases added.)]

10

After defendant's third request for an attorney, Detective Raynor ended the interrogation. The officers then proceeded to arrest defendant on unrelated outstanding traffic warrants.

## B.

On January 18, 2017, a Burlington County grand jury charged defendant with first-degree murder, second-degree possession of a weapon for an unlawful purpose, and second-degree unlawful possession of a weapon.

Before trial, defendant moved to suppress his January 13, 2016 statement, arguing that he did not knowingly waive his Miranda rights because police did not disclose the outstanding traffic warrants prior to questioning. The trial court denied the motion.

On October 17, 2017, a jury trial proceeded. Among other things, the State offered into evidence defendant's statement, surveillance footage from the motel and casino from January 3, 2016, and cell site data placing defendant in the area where Dewyer's body was found. Regarding the January 13 statement, defense counsel did not object to or seek redaction of defendant's statements requesting counsel.[4]

---

[4] Prior to trial, defense counsel and the assistant prosecutor discussed redacting the statement and agreed on numerous portions of the statement to be redacted. Neither the State nor the defense appeared to raise the issue of redacting the portion of the statement when defendant invoked his right to counsel.

After playing a recording of defendant's statement to the jury, the prosecutor asked Detective Raynor, "did [defendant] tell you who he was with that day?" Detective Raynor responded, "No, sir." On cross-examination, defense counsel asked Detective Raynor, "at the end of the video . . . [defendant] said to you a number of times . . . [']charge me with this, call my lawyer['] . . . did you charge him that day?" Detective Raynor responded, "No, ma'am."

The State also called Detectives Anthony Mikulsi and David Kohler to testify as to their review of the surveillance footage. Detective Mikulsi testified that, despite driving together to the casino, defendant entered five to ten minutes before Dewyer, that Dewyer and defendant did not interact much while in the casino, and that Dewyer appeared to be following defendant around the casino while defendant gambled and Dewyer did not. Detective Kohler testified that on the morning of January 3, 2016, defendant wore dark pants, white shoes, and a dark hooded sweatshirt or jacket, and carried a two-toned backpack. Detective Kohler also testified that after defendant returned to the motel alone at approximately 3:28 p.m., after Dewyer was killed, he changed into different clothes, as shown on the video.

The State also called Jeffrey and Sandra Carver to testify.[5] The Carvers testified that at approximately 2:30 p.m. on January 3, 2016, they were driving their tractor on Kinkora Road in Mansfield when they saw a silver car parked oddly on the side of the road. The Carvers slowed down but continued to drive and soon thereafter saw a man walking away from the silver car. The man kept looking back at them as he walked. Jeffrey described the man as wearing "dark pants" and a "dark jacket" with "a little bit of red or [a] bright color around the neck area" possibly from a "hooded sweatshirt," and carrying a "black backpack" with "silver trim." He further described the man as "not a white person" and recalled that he had "light tan" skin. Sandra described the man as "over six f[ee]t and over 200 pounds," in "blue jeans," carrying a "black backpack," and possibly wearing a "red," "orange," or "yellow" hoodie.[6] She further described the man as "brown." The Carvers were never asked to identify defendant in a photographic or in-person lineup or even while in court during the trial.

---

[5] We refer to Jeffrey and Sandra Carver collectively as "the Carvers" and individually by their first names to avoid confusion. We do not intend any disrespect.

[6] In summation, the prosecutor referenced defendant's fingerprint card in evidence that purportedly listed his weight as 265 pounds and his height as six feet, three inches tall.

Defense counsel cross-examined the Carvers, impeaching their credibility and uncertainty over the man's appearance, particularly the difference between Sandra's initial statement and her trial testimony. During her initial audio-recorded statement to police on January 7, 2016, four days after the murder, Sandra stated that the man she saw walking away from the silver car "definitely was not black." When the interviewing officer asked, "he's absolutely not black, 100%?" Sandra responded "no." In Jeffrey's initial January 12, 2016 statement, he recalled that the man had "light tan" skin and "wasn't a white person," consistent with his trial testimony.

During summation, the prosecutor made various arguments to the jury, including the following comments relevant to this appeal. Regarding defendant and Dewyer arriving at the casino, the prosecutor remarked:

> [Defendant] acknowledges James Dewyer has these bad legs, he could hardly get around. But does his good friend, [defendant], drop [Dewyer] off at the front door of that casino? No . . . . [Defendant] doesn't try to help him into the casino. He doesn't try to walk with him. He doesn't stay with him. He's not his friend. He's using him.

As to defendant's change of clothes, the prosecutor stated that,

> after the defendant returns to the motel at 3:28 p.m. on that day . . . nine minutes after . . . he comes out, his clothing is changed. A lot was made during cross-examination about that. Well could they be the same pants? Detective Kohler told you no, he had dark colored pants on when he came back to the motel and a

14

dark colored sweatshirt.  And when he came out he had like pajama pants on . . . .  And then he had a white shirt on . . . .  Well, I submit to you, he just killed [Dewyer] and he's trying not to be seen in the same clothes so he can't be identified.

Next, as to the Carvers' testimony, the prosecutor noted:

It's not a coincidence.  The person that the Carvers saw that day was the defendant.  They couldn't identify him and say yes, that's him, I see his face, it's definitely him but the general description matches.  It's too much of a coincidence to not be him.

Finally, as to defendant's January 13, 2016 statement to police, the prosecutor

argued:

[Defendant] tells Detective Raynor he's down there doing business in Roebling, Detective Raynor practically begged him, well, who you were with, tell us [who] you're with, we'll go out, track it down and talk to this person.  No, I'm not gonna tell you who I was with.

. . . .

We're investigating this murder and then they proceed to read him his <u>Miranda</u> rights.  Yet he still won't give up this person who he's doing business with.  Ask yourself why.  And I'll tell you what the reason is, because this person doesn't exist.  It didn't happen.

Defense counsel did not object to any of the State's summation statements.

After summations, the trial court instructed the jury as to the elements of

first-degree murder; defendant's presumption of innocence, including that his

decision not to testify may not be used against him; and the State's burden to

15

prove defendant's guilt beyond a reasonable doubt. The court also explained that the jury can consider some or all the following factors when evaluating witness testimony:

> The interest or lack of interest that any witness has in the outcome of the trial; the bias or prejudice of a witness, if any; the witness' mental capacity for knowing that about which he or she speaks . . . [;] any prior inconsistent statements or discrepancies in the testimony of a witness; the reasonableness or unreasonableness of the testimony; the manner in which the witness testified; the witness' demeanor on the stand; the willingness or the reluctance to answer questions.

In addition, the court explained that the jury may "disregard all of the testimony" of a witness. Defense counsel did not object or request additional instructions.

On November 2, 2017, the jury found defendant guilty on all counts. On December 14, 2017, the trial court sentenced defendant to life in prison with an eighty-five percent parole-ineligibility term, pursuant to the No Early Release Act, N.J.S.A. 2C:43-7.2.

## C.

Defendant appealed his conviction, submitting both counseled and pro se briefs. In his counseled brief, defendant made the following arguments: (1) the court erred in not giving an identification instruction regarding the Carvers' testimony; (2) the cell site location data testimony should not have

16

been admitted; (3) the court erred in allowing the jury to hear that defendant exercised his right to counsel, that defendant was out on bail at the time of the offense, and kept a firearm in his home; and (4) the case should be remanded for resentencing because the court did not explain why the thirty-year statutory minimum, instead of a life sentence, did not suffice. In his pro se brief, defendant raised additional arguments not relevant to this appeal.

In an unpublished split opinion, the Appellate Division reversed defendant's conviction, vacated his sentence, and remanded the matter for a new trial. The majority found that "the cumulative effect of errors committed during the trial," including various comments made by the prosecutor in summation, "rendered the trial unfair." Specifically, the majority was concerned that the Carvers' testimony was "impermissibly suggestive and prejudicial to defendant, and [that] the jury may have erroneously drawn a conclusion that he was the perpetrator." Although this issue was not briefed by the parties, the majority sua sponte directed the trial court on remand to conduct a hearing pursuant to N.J.R.E. 104(a) to determine the admissibility of the Carvers' testimony, citing this Court's decision in State v. Henderson, 208 N.J. 208, 289 (2011). The majority stated that the Rule 104(a) hearing was necessary for the trial court "to ascertain if the proffered testimony by the Carvers would aid the jury as the trier of fact in deciding the merits of the

17

controversy or whether the Carvers' testimony may cause undue prejudice in the minds of the jurors and should be barred."  The majority ordered the trial court, if the evidence were found admissible, to "provide appropriate, tailored jury instructions explaining how the evidence is to be considered" by the jury.

The Appellate Division majority also appeared to take issue with some of the prosecutor's comments during summation but did not analyze the comments beyond detailing them in its factual recitation.  The court's majority discerned no error in defendant's remaining arguments, including the admission of the cell site location data testimony by the FBI agent.  Regarding defendant's statement to police, the majority held that the "limited exchange" between defendant and the interviewing detectives after defendant invoked his right to counsel, during which the officer continued to ask defendant for his alibi, could not have produced an unjust result.

The dissenting judge found no reversible error, noting that "the majority seemingly suggests four of the prosecutor's closing remarks exceeded the bounds of fair comment," but did not analyze the comments in context with governing law.  The dissent found all four comments addressed by the majority to be supported by the record and that "no unjust result occurred from those remarks -- in part or in combination."

As for the order to conduct a Rule 104(a) hearing, the dissent argued that "the majority's outcome departs from well-established evidentiary principles" because "there was no identification procedure here, [so] there was no basis for the trial court to conduct a . . . preliminary hearing to determine the admissibility of the Carvers' testimony in the present trial." In addition, the dissenting judge agreed that the trial court should have provided a lack-of-identification charge to the jury but nonetheless found no reversible error because "the jury was more generally advised of the State's burden to prove all elements of the charged offenses beyond a reasonable doubt."

The State appealed as of right pursuant to Rule 2:2-1(a)(2).[7] Defendant also filed a petition for certification raising issues beyond the limited scope of the State's appeal, including whether his Fifth Amendment rights were violated when officers continued the interrogation after defendant's invocation of his right to counsel. We initially denied defendant's petition. On January 18, 2022, we heard oral argument on the State's appeal. After oral argument, we sua sponte reconsidered defendant's petition and granted certification, limited to whether defendant's Fifth Amendment rights were violated by the admission of evidence that he requested an attorney when Detective Raynor

---

[7] Rule 2:2-1(a)(2) provides a right to appeal to this Court from final judgments "with regard to those issues as to which, there is a dissent in the Appellate Division."

19

asked for his alibi. 249 N.J. 559 (2022). A second oral argument was held regarding the issue granted on certification.

## II.

Regarding the appeal as of right, the State argues that the Appellate Division improperly reversed defendant's conviction on grounds not raised or briefed. The State contends that no reversible error occurred. The State asserts that the admission of the Carvers' testimony was not plain error because the testimony tended to prove a fact in dispute, namely defendant's whereabouts on January 3, 2016. The State also argues that the risk of unfair prejudice was minimal because the Carvers did not identify defendant and were cross-examined by defense counsel.

Moreover, the State argues the trial court's failure to provide a lack-of-identification instruction was not reversible error. The State first notes that defendant did not raise this argument at trial. Further, according to the State, the trial court provided the jury with sufficient instructions to consider the Carvers' testimony. The State argues that because the Carvers did not identify defendant, the enhanced jury instructions in Henderson were unnecessary.

On the Fifth Amendment issue, the State responds that neither the admission of defendant's statement nor the prosecutor's comments are reversible error. Moreover, the State maintains that each of the prosecutor's

20

comments were based on evidence in the record and within the bounds of fair comment. Specifically, the State contends that the prosecutor's comment that Detective Raynor "practically begged" defendant for information did not exploit defendant's invocations of counsel, but rather "acknowledged" defendant's refusal to elaborate on his alleged alibi. The State also argues that the weight of the evidence against defendant outweighs any alleged comment on his invocation. Finally, the State notes that, at trial, defense counsel did not raise the argument above and used the invocations to defendant's advantage. Therefore, the State argues that any error arising from the admission of defendant's invocation was invited.

Defendant argues that his Fifth Amendment rights were violated when the trial court admitted into evidence the portions of his statement that included his invocations of the right to counsel. Defendant maintains that the admission of that portion of the statement without a limiting instruction ran the risk of the jury inferring guilt from his invocations. Defendant further argues that the prosecutor's questioning of Detective Raynor after the statement was played for the jury, as well as the prosecutor's comments in summation that defendant refused to provide exculpatory evidence after Detective Raynor "practically begged" him to do so, improperly suggested that the jury should infer guilt from the invocations.

Regarding the State's appeal, defendant responds that the Appellate Division properly found cumulative error. First, defendant submits that the Appellate Division "unanimously . . . agreed that the trial court erred by not instructing the jury to evaluate the sufficiency and reliability of eyewitness proofs of identity" and "h[e]ld that the trial court erred by admitting eyewitness evidence of [defendant's] identity without any jury instruction." Specifically, defendant maintains that the Carvers' testimony amounts to "eyewitness identifications," and that "a model identification charge should be given in every case in which identification is a legitimate issue." (quoting State v. Davis, 363 N.J. Super. 556, 561 (App. Div. 2003)). Accordingly, defendant asserts that the trial court permitted the risk of the jury believing that he carried the burden to prove his innocence.

### III.

As defendant did not object to any of the trial court rulings that he contends were error, we review the issues presented for plain error. See R. 2:10-2. Under that standard, an unchallenged error constitutes plain error if it was "clearly capable of producing an unjust result." Ibid. The possibility of an unjust result must be "sufficient to raise a reasonable doubt as to whether the error led the jury to a result it otherwise might not have reached." State v. Melvin, 65 N.J. 1, 18-19 (1974) (quoting State v. Macon, 57 N.J. 325, 336

22

(1971)).  To determine whether an alleged error rises to the level of plain error, it "must be evaluated 'in light of the overall strength of the State's case.'" State v. Sanchez-Medina, 231 N.J. 452, 468 (2018) (quoting State v. Galicia, 210 N.J. 364, 388 (2012)).

A.

We first address the issues raised in the State's appeal as of right.  The Appellate Division reversed defendant's conviction and directed that the trial court hold a Rule 104(a) hearing on remand to determine the admissibility of the Carvers' testimony.  In dissenting, Judge Rose concluded that there was no basis for a Rule 104 hearing because the Carvers never identified defendant, either in or out of court.

N.J.R.E. 104(a) states:

> (a) In General.
>
> (1) The court shall decide any preliminary question about whether a witness is qualified, a privilege exists, or evidence is admissible.  In so deciding, the court is not bound by evidence rules, except those on privilege and Rule 403.
>
> (2) The court may hear and determine such matters out of the presence or hearing of the jury.

Much of this Court's case law analyzing the necessity of a Rule 104 hearing to determine the admissibility of witness identification testimony has arisen from cases in which a witness actually identified the defendant or

23

suspect pursuant to an identification procedure such as a photo array. See, e.g., State v. Chen, 208 N.J. 307, 329-30 (2011) (holding that a Rule 104 hearing was necessary to determine whether a private party's suggestive behavior tainted the reliability of the witness's identification of defendant's picture).

Here, police never conducted a photo array for either Jeffrey or Susan Carver to have them attempt to identify defendant as the person they saw on the day of the murder walking down Kinkora Road. The Carvers also did not participate in a show up or lineup or attempt to identify defendant in court. There was never an identification in this case, so there was no need for a Rule 104 hearing.

As the State readily conceded, this was a circumstantial evidence case. No one was able to identify defendant as the perpetrator, so the State has pieced together evidence that tends to show defendant committed the murder. The Carvers' testimony is one of those pieces. Their testimony is relevant and presumed admissible because it tends to prove that defendant was near the scene of the crime around the time of the crime, contrary to his alibi. See N.J.R.E. 401, 402. Furthermore, nothing in the record suggests that the probative value of their testimony is "substantially outweighed by the risk of . . . [u]ndue prejudice, confusion of issues, or misleading the jury." N.J.R.E.

24

403(a). The Carvers never once identified defendant as the person they saw. Their testimony simply shed light on a person, who appears to fit defendant's description, being present in the same area and at approximately the same time that Dewyer was killed. There is nothing about that testimony that requires a Rule 104 hearing.

On the issue of the lack of identification charge, we agree with the Appellate Division that the charge should be given to the jury on remand. See Model Jury Charges (Criminal), "Identification: No In-or Out-of-Court Identification" (approved Oct. 26, 2015). The trial court did thoroughly instruct the jury as to the State's burden and how to evaluate the credibility of witness testimony, in accordance with the spirit of the model charges. So although the trial court's failure to give the charge, standing alone, did not "possess[] a clear capacity to bring about an unjust result," State v. Afanador, 151 N.J. 41, 54 (1997) (alteration in original) (quoting State v. Jordan, 147 N.J. 409, 422 (1997)), the charge should be given on remand because this is a case in which there was no identification by any witnesses.

B.

As for the prosecutor's comments in summation, it is unclear from the majority opinion whether the court found the statements referenced in its factual recitation to have exceeded the bounds of proper conduct, thereby

25

contributing to the cumulative error that the court found. The dissent noted that the extent of the cumulative error found by the majority was not fully analyzed in the opinion, but discerned that the summation comments, along with the Carvers' testimony, contributed to the majority's finding that the trial was unfair. Because the dissent discusses the issue of the summation comments at length in departing from the majority, we do so as well.

In detailing the facts of the case, the majority highlighted the following four comments made by the State during summation: (1) comments "intended to malign defendant's character" when the prosecutor pointed out that defendant did not assist Dewyer in walking into the casino; (2) statements regarding defendant changing his clothes when he returned to the Riverfront Motel without Dewyer; (3) the prosecutor's comment that the person the Carvers saw the day of the murder was defendant; and (4) "without defendant having the benefit of counsel," the prosecutor's statement that the detective "practically begged" defendant for defendant's alibi but he refused to tell police who he was with that afternoon.

"[P]rosecutors in criminal cases are expected to make vigorous and forceful closing arguments to juries . . . ." State v. Williams, 244 N.J. 592, 607 (2021) (quoting State v. Frost, 158 N.J. 76, 82 (1999)). "Prosecutors are afforded considerable leeway in closing arguments as long as their comments

26

are reasonably related to the scope of the evidence presented." Frost, 158 N.J. at 82. "[A]s long as the prosecutor stays within the evidence and the legitimate inferences therefrom, [t]here is no error." Williams, 244 N.J. at 607 (second alteration in original) (quotation marks omitted) (quoting State v. McNeil-Thomas, 238 N.J. 256, 275 (2019)). If defense counsel fails to object contemporaneously to the prosecutor's comments, "the reviewing court may infer that counsel did not consider the remarks to be inappropriate." State v. Vasquez, 265 N.J. Super. 528, 560 (App. Div. 1993) (citing State v. Johnson, 31 N.J. 489, 511 (1960)).

We will discuss the fourth summation comment below in our discussion of defendant's statement and invocation of his right to counsel. Regarding the first three statements, we find that those comments in summation were proper commentary on the evidence before the jury and not "so egregious as to [have] deprive[d] defendant of a fair trial." McNeil-Thomas, 238 N.J. at 275 (quoting State v. Wakefield, 190 N.J. 397, 437 (2007)). Those statements by the prosecutor were confined "to the evidence revealed during the trial." State v. Smith, 167 N.J. 158, 178 (2001). The video of defendant and Dewyer entering the casino was in evidence. At trial, the defense made much of the close friendship between defendant and Dewyer. In his statement to police, defendant talked about the trouble Dewyer had with his legs, and even stated

27

that he often drove Dewyer's car because of the pain the victim experienced. The State's comments about defendant not helping Dewyer were fair comment on the record.

The same holds true for the comment about defendant changing his clothes on the afternoon of the murder. The surveillance evidence of defendant arriving at the Riverfront Motel without Dewyer and then later exiting the motel in different clothes was in evidence before the jury. It was not improper for the prosecutor to point out this change and infer that defendant allegedly sought to evade detection by changing his clothes.

Lastly, regarding the comment that the person the Carvers saw was defendant even though the Carvers never identified defendant, the prosecutor was once again allowed to draw an inference from the evidence presented. The prosecutor was even careful to remind the jury that the Carvers "couldn't identify him," but noted that their general description of the person they saw matched defendant. Nothing in those comments amounted to reversible error.

## IV.

We now turn to the issue of whether defendant's Fifth Amendment rights were violated by the admission of and comment on his invocations of his right to counsel. Again, because defendant did not raise this issue below, we review the trial court's ruling for plain error. R. 2:10-2.

## A.

The Fifth Amendment of the United States Constitution, applicable to the States through the Fourteenth Amendment, see State in Int. of A.A., 240 N.J. 341, 351 (2020), guarantees that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself," U.S. Const. amend. V. Although not included in the New Jersey Constitution, the right against self-incrimination is deeply rooted in New Jersey common law and is codified by statute and the Rules of Evidence. See N.J.S.A. 2A:84A-19; N.J.R.E. 503.

In Miranda v. Arizona, the United States Supreme Court held that individuals who are "subjected to police interrogation while in custody . . . or otherwise deprived of [their] freedom of action in any significant way" must be appropriately advised of certain rights so as to not offend the right against self-incrimination. 384 U.S. at 477-79. Miranda warnings include advice as to the right to remain silent and of the right to the presence of an attorney during any questioning. Id. at 479. Pursuant to Miranda, if an "individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease." Id. at 473-74. Furthermore, "[i]f the individual states that he wants an attorney, the interrogation must cease until an attorney is present." Id. at 474.

This Court has reaffirmed time and time again that "[t]he privilege against self-incrimination . . . is one of the most important protections of the criminal law," State v. Presha, 163 N.J. 304, 312 (2000), and has afforded the state privilege broader protection than its Fifth Amendment counterpart, see, e.g., State v. O'Neill, 193 N.J. 148, 176-77 (2007). That broader protection includes the principle that "a suspect need not be articulate, clear, or explicit in requesting counsel; any indication of a desire for counsel, however ambiguous, will trigger the entitlement to counsel." State v. Reed, 133 N.J. 237, 253 (1993); see also Chew, 150 N.J. at 63 (rejecting the federal law standard under which the invocation of counsel must be "unambiguous or unequivocal" in order for officers to stop the questioning and holding instead that, "[b]ecause the right to counsel is so fundamental, an equivocal request for an attorney is to be interpreted in a light most favorable to the defendant").

In situations in which a suspect has waived his or her Miranda rights and agreed to speak to law enforcement, but later invoked the right to counsel during the interrogation, this Court has held that "trial courts should endeavor to excise any reference to a criminal defendant's invocation of his right to counsel" from the statement that the jury hears. State v. Feaster, 156 N.J. 1, 75-76 (1998). "[A] trial court's failure to follow the Feaster stricture of excision or a cautionary instruction does not necessarily equate to reversible or

30

plain error"; rather, a harmful error analysis is warranted to determine whether the defendant was deprived of a fair trial. State v. Tung, 460 N.J. Super. 75, 94-95 (App. Div. 2019) (holding that allowing the jury to hear the two instances of defendant's invocation of counsel constituted plain error).

In Feaster, the Court found that the error was harmless because of "the fleeting nature of the reference to defendant's invocation of his right to counsel" and the fact that "the prosecutor did not comment on the matter during summation." Feaster, 156 N.J. at 77. The Court further noted that when "testimony explaining why an interview or interrogation was terminated" is necessary, "instruction should be provided that explains to the jury that people decline to speak with police for many reasons, emphasizing that a defendant's invocation of his right to counsel or right to remain silent may not in any way be used to infer guilt." Id. at 76.

In Doyle v. Ohio, the Supreme Court held that although "the Miranda warnings contain no express assurance that silence will carry no penalty, such assurance is implicit to any person who receives the warnings." 426 U.S. 610, 618 (1976). Indeed, it would be counterintuitive for suspects to be told that they have the right to not speak, to ask for an attorney, and to stop the interrogation at any time, if at the same time their invocation of those rights could be used against them at trial. See United States v. Hale, 422 U.S. 171,

31

182-83 (1975) (White, J., concurring in the judgment) ("[W]hen a person under arrest is informed, as <u>Miranda</u> requires, that he may remain silent, . . . and that he may have an attorney if he wishes, . . . it does not comport with due process to permit the prosecution during trial to call attention to his silence . . . and to insist that . . . an unfavorable inference might be drawn . . . ."). And as the Supreme Court noted in <u>Wainwright v. Greenfield</u>, post-<u>Miranda</u> "silence does not mean only muteness; it includes the statement of a desire to remain silent, as well as of a desire to remain silent until an attorney has been consulted." 474 U.S. 284, 295 n.13 (1986).

B.

In the present case, we find that it was error to play for the jury the portion of the statement wherein defendant invoked his right to counsel and Detective Raynor continued questioning him. That error was further emphasized by the prosecutor's comments in summation. Given the State's circumstantial case, allowing all that to go before the jury was clearly capable of producing an unjust result.

Defendant's statement to police, as played for the jury, was approximately 48 minutes long. Most of that interview was conducted in a friendly atmosphere; defendant told officers about his friendship with Dewyer,

his interest in betting on racehorses, and even the date defendant went on the night of the murder.

At approximately 41 minutes into the interview, Detective Raynor confronted defendant for the first time with the State's theory that defendant murdered Dewyer. It was at that time that defendant invoked his right to counsel by stating, "charge me, call my attorney Mr. Keisler over here, charge me and let's go." At that moment, all questioning should have ceased. Defendant, by specifically naming his attorney and telling officers to call him, invoked his right to counsel. However, even if his invocation could be viewed as equivocal or ambiguous, the detectives were not justified in continuing the interrogation under New Jersey law. There is no question that the interrogation should have ended at that point and that portion of the recording should have been excised from the statement played, not once, but twice for the jury.[8]

The interrogation, however, did not end there. Instead, Detective Raynor continued to press defendant about his alibi, continuously asking defendant whether he wanted the detective to "run that down," in reference to the person defendant stated he was with in Roebling. Defendant, for the most

---

[8] During deliberations, the jury asked to view defendant's statement again and it was played for them in open court.

part, said little during this exchange, except to tell the officers to "call my attorney" and then twice telling them "go get my attorney." During the exchange, Detective Raynor expressed that if he were in defendant's shoes, he would tell the officers who he was with so that he is "not on the hook for [the murder]."

The jury not only heard the invocation and the detective's comments thereafter, but also heard the prosecutor give a summation that compounded the error by commenting on the discussion that took place after the invocations. The prosecutor noted that Detective Raynor "practically begged" defendant for information on his alibi. The State argues that defendant willingly provided an alibi during his statement and, therefore, the prosecutor's statements were fair comment on defendant's alibi statements.

Certainly, the portion of defendant's statement prior to invocation of his right to counsel is admissible. During that portion of the statement, he provided officers with an alibi when he stated that Dewyer dropped him off in Roebling where he met with someone. Defendant was hesitant to tell the officers exactly what he did in Roebling and with whom. The videotaped statement the jury heard was redacted to remove approximately one minute and 48 seconds of that portion of the interview during which defendant implied to police that he met with someone in Roebling to apparently complete a drug

34

deal.  The jury, however, only heard the following exchange in the redacted

video:

> DETECTIVE:  Where, where does he drop you off in Robley?
>
> DEFENDANT:  Uh, right there by the, uh, by the um, the store.  In between the store and, um what is that, uh, Lou's, Doctor Lou's.
>
> DETECTIVE:  Doctor Lou's okay.
>
> DEFENDANT:  Mm hmm.
>
> DETECTIVE:  He drops you off over there.
>
> DEFENDANT:  Mm hmm.
>
> DETECTIVE:  Um, what's goin' on down there?
>
> DEFENDANT:  Uh --
>
> DETECTIVE:  I can see you're hesitating, I mean, I'm not, I'm less concerned about what was going on and just, you know, where he goes, who he's with and then, you know, what's goin' on with you down there.  Does he, does he hang around with you?
>
> DEFENDANT:  No, no, he didn't hang around.  I, um, to see I'm hesitant because this is involving, it, it --
>
> DETECTIVE:  It's something you don't wanna talk about.
>
> DEFENDANT:  Right.
>
> DETECTIVE:  Okay.
>
> DEFENDANT:  You know.

35

DETECTIVE: All right.

DEFENDANT: That I, that I did, you know.

DETECTIVE: Okay, um.

DEFENDANT: Uh.

DETECTIVE: And like I said, I'm trying to word this where it's not, um, it would be helpful, uh, you know for us to just have an understanding of, in piecing this together.

DEFENDANT: Okay, I --

DETECTIVE: You know, was he with somebody else or did you guys meet up --

DEFENDANT: No.

DETECTIVE: With somebody else or, or what?

DEFENDANT: No.

DETECTIVE: Okay.

DETECTIVE: All right, so you met with somebody.

DEFENDANT: Right.

DETECTIVE: Okay. All right, down there near Dr. Lou's?

DEFENDANT: Mm hmm.

DETECTIVE: All right. Um, do, were you, when he dropped you off at Dr. Lou's, um do you go any, like does somebody else pick you up and you go somewhere and what?

36

DEFENDANT:  Uh, we take a walk.

DETECTIVE:  You and whoever take a walk.

DEFENDANT:  Yeah, mm hmm.

DETECTIVE:  Okay.  You and whoever take a walk.

DEFENDANT:  Mm hmm.

DETECTIVE:  Um, do whatever it is you have to do.

DEFENDANT:  Mm hmm.

DETECTIVE:  Okay and then what?

DEFENDANT:  And that's it.

DETECTIVE:  Okay.

DEFENDANT:  And well after he drops me off, I would suspect he went to pick up Judy's daughter.

DETECTIVE:  Okay.

DEFENDANT:  Other than that, you know, that's okay of what I needed to take care --

DETECTIVE:  Mm hmm.

DEFENDANT:  And I made my way back up to my room.

That portion of the statement was certainly open for fair comment

because defendant had waived his <u>Miranda</u> rights and told police during the

interview that followed that he was in Roebling during the time of the murder.

37

But when the prosecutor in summation stated, "Detective Raynor practically begged him, well, who were you with, tell us [who] you're with, we'll go out, track it down and talk to this person," it cannot be logically concluded that the prosecutor was referencing that pre-invocation portion of the statement. Nothing in that exchange can be reasonably characterized as the detective "begging" defendant for more information on his alibi and imploring him to allow the police to track the person he was with down and talk to them.

Contrast that, however, with the exchange between Detective Raynor and defendant <u>after</u> defendant invoked his right to counsel. Detective Raynor continued to ask defendant questions as quoted above, <u>see</u> <u>supra</u> pp. 9-11. After defendant first invoked his right to counsel by stating, "You say it's game over, charge me, call my attorney Mr. Keisler over here, charge me and let's go," Detective Raynor asked defendant no fewer than four times whether defendant wanted the officers to run his alibi down. As already discussed, Detective Raynor further commented that if he was in defendant's shoes, he would readily give the officers all the information about his alibi so as not to be "on the hook" for a murder. The prosecutor in summation characterized that exchange as "begging" defendant for the alibi information. Surely, it was <u>that</u> exchange, after defendant had already invoked his right to counsel, to which the prosecutor's comments harkened back. It was during that exchange

38

that Detective Raynor repeatedly mentioned tracking or running down the alibi information.

The exchange, however, took place after defendant had already invoked his right to counsel and the interrogation should have ended. Although that portion of the statement should not have been in evidence or before the jury, it was introduced. The prosecutor thus likely believed he was free to comment on it, and his comments certainly do not rise to the level of misconduct. Nevertheless, those comments fueled the original error of allowing in the invocation of defendant's right to counsel. And although the prosecutor did not directly comment on defendant's invocation of his right to counsel, the prosecutor's inference that defendant was guilty because he did not provide the name of the person he was with in response to the detective's "begging" was improper.

Prior to trial, the prosecutor and defense counsel discussed redactions to the statement to ensure that all references to defendant's criminal history and the alleged illegal activity in Roebling defendant discussed would not be played for the jury. Somehow, all the parties to this matter at trial -- the State, defense counsel, and the court -- missed the necessary redaction of defendant's invocation of his right to counsel. When defendant invoked his right to counsel by specifically naming his attorney, alarm bells should have gone off

signaling to all parties that the information should have been redacted.[9] Unfortunately, everyone missed it.

We find that allowing the jury to hear defendant's invocation of his right to counsel, the detective's statements thereafter, and the prosecutor's comments in summation could have led the jury to a result it otherwise might not have reached. The State concedes that its case against defendant was circumstantial. There were no eyewitnesses to the murder, no murder weapon was ever recovered, and defendant never confessed to killing Dewyer. It was therefore harmful for the jury to have improperly heard defendant invoke his right to counsel at the moment he was confronted with murdering Dewyer and

---

[9] The State argues that defendant invited this error because he did not seek to redact the invocation portion of the video when he requested redaction of other portions of the statement. Under the invited error doctrine, "trial errors that 'were induced, encouraged or acquiesced in or consented to by defense counsel ordinarily are not a basis for reversal on appeal.'" State v. A.R., 213 N.J. 542, 561 (2013) (quoting State v. Corsaro, 107 N.J. 339, 345 (1987)). Unlike most cases with invited error, in which the court is encouraged to take a particular course of action, defense counsel here initially, but unsuccessfully, sought to suppress the entire statement, not use it to defendant's advantage. Once the offending portions of the statement were in and were played for the jury, defense counsel had no choice but to deal with the reality of all that the jury had heard and made a fleeting reference to defendant's invocations as a means of pointing out to the jury that officers did not charge defendant with the murder on the day he gave his statement, despite his assertions for them to do so. We cannot find from this record that defense counsel invited the error.

40

then hear the prosecutor insinuate defendant's guilt based on defendant's refusal to tell the officers who he was with in Roebling.

V.

For the foregoing reasons, we affirm the judgment of the Appellate Division as modified, and we remand the matter for a new trial consistent with this opinion.

CHIEF JUSTICE RABNER and JUSTICES ALBIN, PATTERSON, and SOLOMON join in JUSTICE PIERRE-LOUIS's opinion. JUDGE FUENTES (temporarily assigned) did not participate.